UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
FENDI ADELE S.R.L.; FENDI
S.R.L. and FENDI NORTH AMERICA,   :   REPORT & RECOMMENDATION

                                  :   06 Civ. 0085 (LBS)(MHD)
                Plaintiffs,

                                  :
        -against-

                                  :
BURLINGTON COAT FACTORY WAREHOUSE
CORP. et al.,                     :

                Defendants.       :
----------------------------------x                    4/28/09

TO THE HONORABLE LEONARD B. SAND, U.S.D.J.:

    In this Report and Recommendation we address the extent of the

relief to be awarded to plaintiffs (collectively "Fendi") in the

wake of the District Court's grant of summary judgment on Fendi's

claim for civil contempt against defendants Burlington Coat Factory

Warehouse Corporation and Cohoes Fashions, Inc. (collectively

"Burlington").

## Prior Proceedings

    On October 10, 2007, the District Court granted a motion by

Fendi for an order holding Burlington in civil contempt for

violation of a permanent consent injunction that had been "so

ordered" by the court on May 19, 1987. Fendi Adele S.R.L. v.

Burlington Coat Factory, 2007 WL 2982295, at *5 (S.D.N.Y. Oct. 10,

1

2007). The 1987 injunction had prohibited Burlington from purchasing or selling "any merchandise bearing the Fendi trademark" without prior permission by Fendi. Id. at *1.[1]

In support of its holding, the court found that Burlington had begun selling Fendi-branded merchandise in 2002 and that Fendi had sent Burlington a series of cease-and-desist letters beginning in April 2004, accusing Burlington of selling counterfeit Fendi bags. The companies continued to exchange correspondence concerning the genuineness of these items, apparently both unaware of the 1987 injunction. Finally, in December 2005 counsel for Fendi wrote still another letter to Burlington, for the first time invoking the injunction. Although Burlington took no action upon receipt of that letter, within days after Fendi's filing of this lawsuit on January 5, 2006, Burlington sent out instructions to remove that merchandise from its shelves. Id. at *1-2. The court also found, however, that in 2007, long after having been reminded of the injunction, Burlington was still actively marketing a Fendi-labeled perfume. Accordingly, the court concluded that Burlington had been in violation of the injunction since 2002, that the violation constituted negligence until 2006, and that, from then on, its

---

[1] The court's decision addressed only one of Fendi's multiple claims in this lawsuit, most of which concern defendants' alleged acquisition and sale of counterfeit Fendi goods.

2

violations in connection with the marketing of perfume were
willful. Id. at *2-5.

In their motion plaintiffs sought a declaration of contempt
and more concrete relief in the form of disgorgement of
Burlington's profits from sales of Fendi-branded merchandise since
entry of the injunction, as well as an award of fees and costs
under S.D.N.Y. Civil Rule 83.9(a). Having found Burlington in
contempt and in willful violation for a portion of the period, the
court directed that Fendi recover Burlington's profits and its own
attorney's fees and other costs. Id. at *5-6. It also authorized
plaintiffs to appoint a consultant to examine Burlington's books
and records in order to account for profits, id. at *6, and
subsequently referred the matter to me to recommend the amount of
an award. (Endorsed Order dated Dec. 20, 2007).[2]

Following an examination of Burlington's records (including
its purchase and sales database) by Fendi's consultant, Mr. James
J. Donohue, we directed that the parties provide affidavits and

---

[2] We note that in the interim Burlington moved to reargue
the contempt finding, an application that the District Court
denied in substance at a November 5, 2007 conference. (Nov. 5,
2007 Tr. at 3-7). Because the court made certain comments from
the bench about its view at the time concerning what issues were
still open, Burlington has sought to press the notion that a
number of the court's key written conclusions are no longer
operative, an assertion with which we disagree, for reasons
discussed below in the text. See p. 34 n. 21, infra.

3

other pertinent documentation in accordance with a specified schedule to address the scope of the monetary relief. At the same time we noted that no evidentiary hearing would be conducted unless the evidentiary submissions reflected a need for one. (Jan. 31, 2008 Tr. at 33-34). We have since received extensive papers from Fendi, principally in the form of a report by its consultant, Mr. Donohue, reflecting his findings as to the profits engendered by Burlington's sales of Fendi-branded goods preceding and then postdating the contempt finding. (Decl. & Report of James J. Donohue, executed Mar. 5, 2008). We also received evidence, in the form of two declarations on behalf of Fendi, indicating that even after the contempt finding there were some sales of Fendi-branded perfume in a Staten Island store operated by Burlington. (Decls. of Joseph R. Parilla, executed Oct. 27, 2007 & Dec. 18, 2007). Finally, Fendi presented an attorney's declaration to document its fee and cost request. (Decl. of Richard L. Mattiaccio, Esq., executed Mar. 5, 2008).

From Burlington we received initially a document that its counsel characterized as an "Offer of Proof" summarizing the measurement of profits by Burlington's newly hired expert, a CPA named Robert W. Berliner. (Defs.' Offer of Proof Pursuant to Fed. R. Evid. 103(b) & Pre-Hearing Mem. of Law ("Offer of Proof")). This submission by Burlington was predicated on the evident assumption

4

that the court would conduct an evidentiary hearing on a multitude of issues, some of which had seemingly been addressed by the District Court and others of which were not necessarily in dispute. (E.g., id. at 10-11).

In a follow-up conference with counsel, we again made clear that we would not hold a hearing unless there were material factual disputes between the parties, and we invited Burlington to offer the detailed analysis of its accountant and any other pertinent evidence not yet in the record. (Mar. 19, 2008 Tr. at 12-16, 29-31). Defendants subsequently provided a declaration by their accounting consultant reiterating Burlington's claimed figures for gross revenues, gross profits and allocated indirect expenses. (Decl. of Robert W. Berliner, executed Mar. 27, 2008), and the parties have, in large measure (although not entirely) agreed that the principal, and possibly controlling, issues between them turned on a series of legal controversies, concerning which they have offered briefing. (E.g., Mar. 6, 2008 letter to the Court from Richard L. Mattiaccio, Esq.; Mar. 19, 2008 Tr. at 2-3, 12, 14, 21-22, 24-28).

We now turn to the issues that we view as open to us to decide.

5

CASE 1:06-cv-00085-LAP-MHD   Document 263   Filed 04/28/09   Page 6 of 53

## I. Burlington's Profits: The Parties' Disputes

Although the District Court found that Burlington had begun
violating the 1987 injunction by selling Fendi-branded merchandise
in 2002, Mr. Donohue's review of the extant records maintained by
Burlington reflects that it had begun selling such items as early
as 1993. (Donohue Decl. ¶ 14 & n.9). This conclusion is not
disputed by Burlington, and indeed defendants have not argued that
profits predating 2002 should not be subject to disgorgement on the
basis of the court's prior findings.[3]

---

[3] Burlington does attempt in its current papers to invoke a
statute-of-limitations defense, asserting that insofar as its
pre-2006 contempt was deemed to constitute negligence, any
recovery for the earlier time period should be limited to a
three-year period preceding the filing of the lawsuit under New
York law, that is, not earlier than January 2003. (Defs.' Supp.
Mem. at 5-6 (citing CPLR § 214(4)). In Burlington's answer to the
complaint, however, it asserted a laches defense (Answer at ¶¶
24-66), but not one based on a statute-of-limitations theory.
Similarly, in its opposition to Fendi's motion for partial
summary judgment it invoked laches and not a time bar. (Defs.'
Mem. of Law in Opp'n to Summ. J. at 11-12). The District Court
addressed the laches defense, denying it on the basis of unclean
hands. Fendi, 2007 WL 2982295 at *5 & n.1. Given these
circumstances, we deem defendants to have waived the limitations
defense. See, e.g., Patterson v. Balsamico, 440 F.3d 104, 111-12
(2d Cir. 2006) (statute-of-limitations defense must be raised in
defendant's response to plaintiff's pleadings); Travellers Int'l,
AG v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir.
1994) (failure to plead an affirmative defense constitutes
waiver); Davis v. Bryan, 810 F.2d 42, 44-45 (2d Cir. 1987).

It also bears mention that Burlington cannot evade this
conclusion by arguing that the limitations defense may be applied
to reduce damages. The affirmative defense is one to liability,
see, e.g., Petramale v. Local Union 17, Laborers' Intern. Union
of N. Am., 625 F. Supp. 775, 783 (S.D.N.Y. 1986), rev'd on other

6

As for sales revenues generated by these transactions, Mr. Donohue calculated the total from 1993 through February 2008 as $9,116,663.00. (Id. at ¶ 15 & Ex. 3). Burlington does not dispute this total; indeed, its figure is slightly larger, coming in at $9,119,586.00. (Berliner Decl. at 1 & App. A at 6). For our purposes, there is also no dispute as to Burlington's gross profits (revenue less direct cost) on these sales. Although Mr. Donohue measured those profits as totaling $2,794,290.00 (Donohue Decl. ¶ 16 & Ex. 3), Fendi has represented that it will stipulate to Burlington's slightly lower figure of $2,772,945.00. (Mattiaccio Mar. 6, 2008 letter to the Court at 1).

The parties are principally in dispute as to whether Burlington may deduct from its gross profits a share of various indirect expenses, thus yielding a net profit figure. Burlington proposes to reduce its gross profits by allocating to the Fendi-branded merchandise a percentage of various indirect costs, largely overhead, that is equal to the percentage of Burlington's total revenues accounted for by those Fendi-labeled products. (Berliner Decl. at 2-5 & App. A). Fendi responds with a two-step argument for the notion that Burlington should be denied any deductions as a

---

gds., 847 F.2d 1009 (2d Cir. 1988), and by virtue of defendants' failure to assert that defense until the Court determined liability on the contempt claim, it has surrendered such a legal theory.

7

matter of law. It notes that Burlington has been found to be a willful violator, and it asserts that this finding compels the court to review with great skepticism any effort by defendants to demonstrate that they have indirect costs that sufficiently contributed to the sale of the Fendi-labeled products to justify deducting a share of those costs from defendants' gross profits. Although Fendi does not make an explicit further argument on this point, they imply that Burlington cannot meet this enhanced burden. Fendi then explicitly contends that in any case, as a matter of law, Burlington cannot demonstrate the required "close nexus" between any part of its overhead and the Fendi-branded goods because those goods represented far less than five percent of Burlington's total revenues. (Pls.' Mem. of Law at 2-5).

Apart from this clash, Burlington seeks a further reduction in its disgorgeable profits based on the notion that for an extended period of time -- it claims between October 5, 2003 and December 22, 2005 -- Fendi was aware of defendants' sale of its products and failed to act to enforce the 1987 injunction. Fendi of course asserts that such a reduction would be inconsistent with the District Court's contempt decision and otherwise unjustified.

We address the law-based arguments first and then turn to an assessment of (1) Burlington's effort to show a close nexus between

8

its cited expenses and its sale of Fendi-branded goods and (2) its
attempted justification for its method of allocating costs to the
Fendi sales.

## A. The Effect of the District Court's Willfulness Finding

The fact that Burlington was found to have acted willfully for
a portion of the relevant time period raises a question as to
whether it may, for disgorgement purposes, offset its gross profits
with overhead or other indirect expenses. Analogizing to
intellectual-property cases involving copyrights and trademarks, we
note that some courts have held that willful infringers should be
precluded from deducting overhead. See, e.g., U.S. Media Corp. v.
Edde Entm't Corp., 1998 WL 401532, at *10 n.18 (S.D.N.Y. July 17,
1998) (citing cases). The Second Circuit, however, has made it
clear that willfulness does not necessarily preclude a defendant
from offsetting some of its indirect expenses against gross sales
revenues in measuring the amount of disgorgement, although a
finding of willfulness does affect the analysis.

In addressing this question, our Circuit Court has observed,
in the copyright context, that "we are not prepared to abandon the
teachings of *Sheldon [v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45
(2d Cir. 1939)], in favor of a hard and fast rule denying all

9

overhead deductions to wilful infringers." Hamil Am., Inc. v. GFI, 193 F.3d 92, 106 (2d Cir. 1999). Rather, as Fendi notes, the Court held that the willful infringer bears an enhanced burden in proving a sufficient link (or nexus) between specified categories of expenses and its production or sale of the targeted products. Thus, while

> [e]very infringer shoulders the burden of demonstrating "a sufficient nexus between each expense claimed and the sales of the unlawful goods" . . . before it may deduct any overhead expenses from its profits[,] . . . [w]hen the infringement is found to be wilful, the district court should give extra scrutiny to the categories of overhead expenses claimed by the infringer to insure that each category is directly and validly connected to the sale and production of the infringing product. Unless a strong nexus is established, the court should not permit a deduction for the overhead category.

Id. at 107 (quoting inter alia Manhattan Industs. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 7-8 (2d Cir. 1989), and citing inter alia Kamar Int'l Inc. v. Russ Berrie & Co., 752 F.2d 1326, 1332 (9th Cir. 1984)).

We also note that the enhanced scrutiny of Burlington's expense showing applies only to a limited portion of defendants' presentation. Since the District Court found a willful violation only with respect to sales post-dating 2005, the intensified review commanded by Hamil America applies only to the revenues from those sales.

10

## B. The Small Share of Burlington's Sales Represented By the Fendi-Branded Goods

Citing principally a 1980 decision from the Fifth Circuit, Fendi asserts that if the challenged sales of a product represent less than five percent of the defendants' total sales, the contribution of that product to the defendants' business activities is too small to justify any allocation of overhead in diminution of the defendants' profits subject to disgorgement. (Pls.' Mem. at 4-5 (citing Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 586 (5th Cir. 1980))). Fendi further asserts that this reasoning should apply to disgorgement of profits in the context of a contempt citation, and that in this case Burlington's sales of Fendi-branded products constitute less than one percent of defendants' total sales, thus precluding any offset for overhead. (Id. at 5).

We assume for present purposes that decisional law from intellectual-property cases that address the measurement of an infringer's disgorgeable profits is appropriately applied in the context of a contempt claim arising from trademark litigation. Indeed, the Second Circuit has at least implicitly so assumed in its exegesis on the award of a contemnor's profits in Manhattan Industs., 885 F.2d at 7-8 (invoking trademark and copyright decisions). See also Hamil Am., 193 F.3d at 107 (citing Manhattan

11

Industs., 885 F.2d at 7-8, in copyright-infringement case).[4] That said, Fendi still cannot prevail on this argument. The problem with Fendi's theory is that the cited ruling in Maltina is not based on any articulated and persuasive reasoning, has not been adopted in this (or any other) circuit, has been explicitly rejected by the Ninth Circuit and has been at least implicitly rejected (or disregarded) by the Second Circuit.[5]

As the Ninth Circuit observed in Kamar International, the court in Maltina did not offer a meaningful explanation as to why no overhead deductions were permissible merely because the infringing item represented a small portion of the infringer's sales. See Kamar, 752 F.2d at 1332. Rather, the Fifth Circuit simply relied on a prior decision in S.C. Johnson & Son, Inc. v.

---

[4] To the extent that Burlington may be understood to argue that the trademark and copyright decisions cited by Fendi are distinguishable (see Defs.' Supp. Mem. at 3), we reject that suggestion in light of the cited Second Circuit precedent and the absence of any meaningful explanation by Burlington as to why the definition and calculation of a wrongdoer's profits for purposes of disgorgement should vary depending on whether the disgorgement is for trademark or copyright infringement or for violation of a judicial mandate imposed in a trademark case (or, indeed, in any other case).

[5] We note that one district court in this circuit relied for an alternative holding on this aspect of Maltina. See 20th Century Wear, Inc. v. Sanmark-Startdust, Inc., 1984 U.S. Dist. LEXIS 20527 *12-13 (S.D.N.Y. Jan. 11, 1984), rev'd on other gds., 747 F.2d 81 (2d Cir. 1984). That court, however, did not explain its reasoning, and subsequent decisions here have not followed its lead.

12

Drop Dead Co., 144 U.S.P.Q. 257 (C.D. Cal. 1965). That court in its
turn had rejected, as insufficient, a patent infringer's proof of
cost deductions and had then, in the alternative, said that since
sales of the infringing item had amounted to less than six percent
of the defendant's total sales, the defendant could not deduct any
share of its overhead, and was limited to deducting only "the cost
of sales of the product." Id. at 260 (citing Century Distilling Co.
v. Continental Distilling Corp., 205 F.2d 140, 147 (3d Cir. 1953);
Carter Prods., Inc. v. Colgate-Palmolive Co., 214 F. Supp. 383, 401
(D. Md. 1963)). Finding this conclusory assertion to be
"unpersuasive", the circuit court in Kamar went on to observe:

> The real question, as we see it, is whether any of the
> overhead expenses were caused by the production or sale
> of the infringing goods, not the proportionate amount of
> sales of the goods in relation to total sales. Because of
> the varying situations which may arise and the lack of
> needed flexibility in an arbitrary standard, we decline
> to adopt a legal rule disallowing all overhead deductions
> merely because the sales of the infringing goods
> constitute a small percentage of total sales.

752 F.2d at 1330, 1332.

The pertinent case law from the Second Circuit is also at
least implicitly inconsistent with Fendi's contention. At its heart
the unexpressed rationale for the rule that Fendi invokes is that
if the infringing goods are a tiny proportion of defendant's total
sales, then it is highly unlikely that the purchase, manufacture or

13

sale of those goods increased the company's total overhead in any pertinent category. The short answer to that implicit contention is that the Second Circuit has rejected the notion that a category of overhead may be taken into account only if the infringing activity increased the size of that expense category. See Sheldon v. Metro-Goldwyn Pictures Corp., 106 F.2d 45, 54 (2d Cir. 1939). See also Hamil Am. Inc., 193 F.3d at 105 (the court must determine what expense categories "are actually implicated by the production of the infringing product"); id. at 106 (rejecting trial court holding that only expenses that are increased by the infringing activity may be deducted); In Design v. K-Mart Apparel Corp., 13 F.3d 559, 565-66 (2d Cir. 1994) (test is whether category of overhead "contributed to the production of the infringing items").

Furthermore, the Second Circuit has repeatedly allowed for the deduction of an allocated portion of overhead even when the infringing product represents a small portion of the defendant's output or sales. Thus, in Sheldon, which specified the methodology for determining the size of profits to be disgorged and affirmed the propriety of an infringer deducting some of its overhead, the infringing product was a motion picture, and it constituted only one of more than forty films released by the defendant in the year in question. Despite the fact that the infringing film thus amounted to less than three percent of the defendant studio's

14

output, the Court did not hesitate to approve the reduction of the defendant's profits, for disgorgement purposes, by a share of certain of its indirect costs. To similar effect was Wilkie v. Santly Bros., 139 F.2d 264, 265 (2d Cir. 1943), which approved deductions for overhead despite the fact that the infringing song was one of forty-eight produced by the infringer. Still more dramatically illustrative of the point is Gaste v. Kaiserman, 863 F.2d 1061 (2d Cir. 1988), in which costs were apportioned to reduce revenues even though the case involved only one infringing song, which constituted about one-half of one percent of the "some 200 songs" published by the defendant. Id. at 1071.

In short, we reject Fendi's contention that Burlington may not take any deduction for overhead merely because the Fendi-branded goods constituted a minuscule share of Burlington's sales.

## II. The Adequacy of Burlington's Showing on Deductible Costs

Having rejected Fendi's proposed per se rule for precluding Burlington from indirect-cost reductions, we must consider whether, as a matter of proof, Burlington meets its burden to show an adequate linkage between its sale of Fendi-labeled goods and the expenses that it seeks to deduct from gross profits. We find that it has in part.

15

The basic principles for ascertaining the amount of defendant's recoverable profits that are subject to disgorgement were laid out by the Second Circuit in Sheldon, 106 F.2d 45. The Court there addressed the measurement of a willful copyright infringer's profits from a motion picture that included some infringing elements. The panel therefore initially considered whether the plaintiff should recover all the profits from the partially infringing film or only that portion attributable to the borrowed elements of the production. Having resolved that question by concluding that -- as in patent cases -- even a willful infringer could carry the burden of distinguishing that part of the performance that was non-infringing and thereby seek an apportionment of profits, id. at 51 (deciding that portion of film revenues attributable to infringing elements was twenty percent), the Court then also addressed a series of questions concerning deductions for expenses from gross receipts, an analysis that involved a review of the accounting decision of a special master.

In assessing this matter, the Court first noted that the traditional rule of trusts that a dishonest trustee may be refused "allowance even of his actual expense . . . has been softened." Id. at 51. Thus the Court recognized that even a willful infringer may use expenses that are properly documented and adequately linked to the infringement as deductions from gross revenues. With regard to

16

overhead, the Court rejected the plaintiff's contention that it should be disallowed in its entirety because the defendant "did not show that it had been increased by the production of the infringing picture." Id. at 54. It then proceeded to explain that the appropriate rule was that "[o]verhead which does not assist in the production of the infringement should not be credited to the infringer; that which does, should be; it is a question of fact in all cases." Id.

The Court also determined how gross profits should be measured and what portion of relevant expense items should be applied against those profits. Its conclusions in this regard were very case-specific, and included a ruling upholding the lower court in determining that distribution costs should be allocated based on the number of pictures released, not revenues that each earned, id. at 51-52; an affirmance of a ruling excluding income taxes paid from deductible costs, id. at 53[6]; and rulings on a variety of technical accounting issues specific to film production. Id. at 53-55.

---

[6] The Court in Sheldon acknowledged that this exclusion for taxes for a deliberate infringer, based on a prior Supreme Court decision, "illustrates that in dealing with a conscious wrong-doer, courts do not feel obliged for consistency's sake to take one extreme or the other." Id. at 53 (citing L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 277 U.S. 97 (1928)).

17

The Second Circuit continues to adhere to the basic principles outlined in Sheldon for measuring infringer profits. See, e.g., Wilkie, 139 F.2d at 265 (apportioning overhead on the basis of the number of songs published, not the number of copies of each song sold) (invoking Sheldon); Gaste, 863 F.2d at 1070-71 (noting defendant's burden to document costs and to demonstrate what portion of overhead contributed to the infringing song; defendant may not rest on assumption that extent of such overhead contribution equals the percentage of revenue attributable to the song); In Design v. K-Mart Apparel Corp., 13 F.3d 559, 565-66 (2d Cir. 1994), overruled on other gds., Clark v. Hudson Bay Music, Inc., 104 F.3d 351 (2d Cir. 1996). Moreover, the Court has applied those principles as well in the context of contempt remedies, holding that plaintiff was entitled to contemnor's "net profits", e.g., Manhattan Industs., 885 F.2d at 7 (citing Murphy Door Bed. Co. v. Interior Sleep Systems, Inc., 874 F.2d 95, 103 (2d Cir. 1989)), and that the contemnor bears the burden of proving costs and their contribution to the infringing item. Id. (citing inter alia Sheldon, 106 F.2d at 54).

The principal recent gloss on this approach by the Second Circuit is found in Hamil America, in which the Court summarized, and once again reaffirmed the viability of, the Sheldon analysis of profit measurement and then addressed the effect of a finding of

18

willfulness on the measurement of disgorgeable profits. As explained by the Hamil panel, Sheldon requires a "two step procedure for deducting overhead expenses from an infringer's profits." 193 F.3d at 105. The court must first "determine what overhead expense categories . . . are actually implicated by the production of the infringing product", a process that requires a determination whether there is "a sufficient nexus . . . between a category of overhead and the production or sale of the infringing product." Id. If such a nexus is found, the court does not then "scrutinize for inclusion or exclusion particular items within the overhead category." Id. The second step is to determine "a fair, accurate, and practical method of allocating the implicated overhead to the infringement." Id. The infringer has the burden of offering such a formula, which the court is to assess for reasonableness, a determination that requires a case-by-case factual assessment. Id. (citing inter alia Sheldon, 106 F.2d at 54; quoting 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.03[B], at 14-39 (1996)). The circuit court also emphasized that at both of the two analytical stages -- that is, in determining (1) the amount of the costs and their linkage to the infringement, and (2) whether the proposed formula for allocation is reasonable -- "all presumptions are drawn against the infringer." Id. at 107 (quoting In Design, 13 F.3d at 565-66). See also Nimmer on Copyrights, supra, at 14-40 ("[If] the computation of profits and

19

costs is uncertain due to the failure of the [infringer] to keep adequate records of costs, any doubt in the evidence will be resolved in favor of the plaintiff.").

The Court then went on to address the effect of a finding of willfulness on the measurement of profits. In substance it held that in such a circumstance the court must apply the Sheldon analysis of claimed cost set-offs "with particular rigor", a term that requires the court to "give extra scrutiny to the categories of overhead expenses claimed by the infringer to insure that each category is directly and validly connected to the sale and production of the infringing product." Id. at 107. Otherwise stated, every infringer must show a "strong nexus", that is, it must demonstrate that the expense "'was of actual assistance in the production, distribution or sale of the infringing product.'" id. at 107 (quoting Kamar Int'l, 752 F.2d at 1332), but "the allocation of a willful infringer should be held to a particularly high standard of fairness . . . ." Id.

We apply these standards to Burlington's evidentiary showing, which consists of a declaration by their designated accountant, Mr. Berliner. That submission, the details of which Fendi did not

20

specifically address,[7] consists of a five-page declaration and a seven-page appendix, from which Mr. Berliner devotes three pages of text and seven pages of charts to mentioning some of the categories of expense that he included in his calculation, the categories that he excluded, and his general method for allocating those categories of expenses to the Fendi-branded products.

In substance he started, as previously noted, with gross sales revenues from the sale of Fendi-branded goods, which totaled $9,119,586.00, and he subtracted the total purchase cost of those goods -- according to Burlington, $6,346,641.00 -- yielding a gross profit of $2,772,945.00. (Berliner Decl. at 2 & App. A at 7). As we have observed, these figures do not meaningfully differ from the calculations of Fendi's consultant, Mr. Donohue.

Consistent with Burlington's previously filed Offer of Proof, Mr. Berliner then proceeded to calculate and subtract from gross profits certain allocated portions of what he describes as three

---

[7] When quizzed by the Court at our March 19, 2008 conference as to whether Fendi contested Burlington's calculation of net profits (aside from plaintiffs' law-based arguments for precluding any deductions of indirect expenses), plaintiffs' counsel merely objected that defendants' accountant had not put in an affidavit and stated that the bottom-line results of Mr. Berliner's analysis were not credible, for "[i]f that's the way they operate their business, they would be closed. These figures are nowhere near reality." (Mar. 19, 2008 Tr. at 26). The defendants' calculation of net profits was at no point specifically addressed or countered with alternate calculations.

categories of overhead or general corporate expenses. These include (1) "store expenses", said to amount to an estimated $2,279,899.00, (2) shipping expenses, which he computes as $91,649.00 and (3) income taxes, which he says total $152,528.00. Subtracting these figures from gross profits, he calculates net profits as $248,869.00. (Id. at 4-5 & App. A at 6-7).[8]

Fendi, though given the opportunity, did not file any additional papers responding to the Berliner declaration. At our prior March 19, 2008 conference, however, its counsel had briefly addressed those same net-profit calculations -- earlier embodied in defendants' March 5, 2008 Offer of Proof -- and made clear that it viewed those numbers, reflecting a net profit of less than $300,000.00, were "nowhere near reality." (Mar. 26, 2008 Tr. at 26).

Since the adequacy of Burlington's showing to meet its burden

---

[8] In the appendix to the declaration, Mr. Berliner separates the revenues and expenses into four time periods: (1) prior to October 5, 2003, (2) from October 5, 2003 to December 22, 2005, (3) from December 23, 2005 to January 9, 2006, and (4) from January 10, 2006 to October 10, 2007. (Id. App. A at 7-12). These four periods are the subject of arguments by Burlington's counsel in his accompanying papers to the effect that defendants should not disgorge any of its profits while Fendi purportedly "slept" on its rights and that Burlington also should be excused for a period after receiving a reminder about the consent injunction, while it "turned the battleship around." (Defs.' Offer of Proof at 5-8; Mar. 19, 2008 Tr. at 10-12). We address, and reject, these arguments below.

22

of proof is in question, we address each category of its claimed indirect expenses in turn.

A. Store Expenses

The term "store expenses" obviously can cover a vast array of costs and cost categories. Indeed, Mr. Berliner lists some but not all of the expense categories that he includes in this portion of his calculation, describing them as follows: "My calculation does . . . include a pro-rata portion of the expenses of operating BCF's stores . . . such as employee salaries and benefits, rent, utilities, local advertising, etc. After all, to conduct its retail business, BCF had to heat its stores in winter and cool them in summer." (Berliner Decl. at 3).[9] According to Mr. Berliner, he calculated the Fendi-product share of expenses based on the percentage of all "net sales" revenues earned by Burlington that it spent on such "store expenses" in 2006 and 2007, which he says was 25 percent of such revenues. He does not further explain this allocation process or define the term "net sales", although we infer that he derived the 25-percent figure by comparing total Burlington sales revenues to payments for whatever categories he

_____

[9] Mr. Berliner reports that he did not include warehouse-related expenses or what he refers to as corporate expenses. (Berliner Decl. at 3). Although not otherwise explained, we infer that these terms refer to the costs of maintaining and staffing Burlington's warehouses and corporate headquarters.

23

included under the rubric "store expenses", and we further infer that he calculated the "Fendi" share of costs by taking one-quarter of total sales revenues (not net revenues) received for Fendi-branded goods.[10]

Burlington's showing in support of its deduction of multiple cost categories encompassed in "store expenses" is plainly inadequate to carry its burden even if we ignore its status as a willful contemnor during the period beginning in January 2006. First, Mr. Berliner fails to identify all of the cost categories subsumed within the term "store expenses", and hence we cannot even begin to determine whether they all contributed to the sale of Fendi-labeled goods.[11] Second, even with regard to the expense categories that he identifies, a number of them are so broad (for

---

[10] In making this inference, we rely on the math ($2.3 million is approximately one quarter of gross sales revenues of $9.1 million from Fendi-labeled goods) even though Mr. Berliner claims that he took 25 percent of "net sales". (Berliner Decl. at 4). As noted, Mr. Berliner does not define the term "net sales".

[11] The types of expenses alluded to by Mr. Berliner as being lumped together under the term "store expenses" -- such as rent, advertising, salaries, as well as the "etc." he mentions -- must be addressed separately to assess their contribution to the sale of the prohibited items. See Hamil Am., 193 F.3d at 105 ("The first step is to determine what overhead expense categories (such as rent, business entertainment, personnel and public relations) are actually implicated by the production of the infringing item."). See also id. at 104-05 (describing Sheldon as concluding "that certain categories of general overhead expenses" -- in that instance the cost of "creating and maintaining a supervising staff and organization" -- could be deducted from gross revenue).

24

example, employee salaries and benefits, and local advertising) as to suggest that they (or some distinct portion of them) do not contribute to the sale of Fendi-branded goods. By not describing the categories it mentions beyond a one- or two-word label, Burlington makes it impossible for the court -- even if we disregarded defendants' burden of proof -- to determine the nature of the linkage of the cost category to the sale of Fendi goods.[12] Third, as noted, Burlington does indeed bear the burden of demonstrating the linkage, and it does not do so in any specific terms.[13] Fourth, Burlington fails to provide category-by-category costs so that the proffered cost total could be adjusted to correct for improperly included expense categories. Fifth, Burlington provides no documentation of the purported total costs, much less a category-by-category breakdown. Sixth, the percentage that Mr. Berliner derived was based on "store expense" data for only two years, 2006 and 2007, and Burlington offers no meaningful explanation for not providing him with the data for the bulk of the

---

[12] The absence of this information raises such questions as: Do salaries include management personnel? If so, what is the direct contribution (if any) of such personnel to the sale of Fendi products? Does the advertising amount to promotions for specific brands (presumably not Fendi) or institutional advertising for Burlington rather than advertising for Fendi products? If so, what is the direct linkage (if any) to the sale of Fendi-branded goods?

[13] The only effort in this direction is a one-sentence reference by Mr. Berliner to the need to heat and cool the stores (Berliner Decl. at 3), a comment that presumably refers to the expense (not stated) for utilities.

25

pertinent period.[14]

In sum, Burlington does not meet its burden on the first stage of the required proof of deductible expenses. It does not demonstrate that specific identified expense categories directly contributed to the sale of Fendi-branded goods and does not establish the amount of the costs attributable to any such category. See, e.g., Manhattan Industs., 885 F.2d at 8 (affirming rejection of all overhead deductions based on percentage of overhead for all products rather than overhead for the infringing products; Court observes that while "[t]here is some support for the proposition that a party may approximate overhead in the absence of reliable data pertaining to actual overhead," the defendant "has not adequately demonstrated that reliable data are unavailable.").[15]

_____

[14] Mr. Berliner reports that he relied on data for "store expenses" for 2006 and 2007. Apart from not specifying the substance of that data, he does not explain why, as he says, data for earlier years "was not available". (Berliner Decl. at 4). He goes on to say that he relied on that temporally limited data because Burlington's "total selling and administrative expenses (which include store expenses) have remained relatively constant in relation to net sales from 1998 to 2007." (Id.). He supplies no figures (much less documentation) to back up this conclusory assertion.

[15] We note that Burlington was initially resistant to providing any evidentiary support for its position on cost calculation, apparently on the assumption that it was entitled to an evidentiary hearing on demand. Indeed, rather than supplying any evidence on its original submission despite the court setting a schedule for serving affidavits, it provided solely a

Burlington also fails to address the question of whether the allocation of costs to the Fendi sales based on comparative sales revenues was reasonable. As observed, this too was its burden, and we note that in some other cases the type of revenue-based allocation relied on by Burlington was rejected as not demonstrably reasonable under the circumstances. See, e.g., Gaste, 863 F.2d at 1071; Wilkie, 139 F.2d at 265. See also Century Distilling, 205 F.2d at 147. In any event Burlington does not discuss this matter, and also, as noted, fails to justify (or even explain) the reasonableness of assessing store expenses for a fifteen-year period based on data (not disclosed to the court) for a two-year period.[16]

conclusory and unenlightening document entitled "Offer of Proof". At our March 19, 2008 conference we noted that omission and gave Burlington another opportunity to provide the evidence by a supplementary submission, while warning -- as we had at the prior conference (Jan. 31, 2008 Tr. at 33-34) -- that we would not conduct an evidentiary hearing absent a genuine dispute as to the material facts. (Mar. 19, 2008 Tr. at 12-16, 29-31). That directive triggered the submission by Burlington of the Berliner declaration and appendix, which we are now analyzing.

As reflected in our statements at the two conferences, we do not read S.D.N.Y. Civil Rule 83.9(b) as giving the contemnor an automatic right to a hearing absent a showing of triable disputes as to the material facts concerning either the alleged violation or the extent of damages. Consistent with the contemnor's recognized burdens of proof, if he does not present competent evidence sufficient, if unchallenged, to meet his burden, no hearing is required.

[16] It also bears mention that, for other purposes, Burlington asserts that the two years in question (2006 and 2007) were not representative of the entire period since it was only in those two years that it had received refreshed notice of the 1987

27

Given these various omissions, we conclude that no deduction should be permitted for "store expenses" on the current record. See, e.g., Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 176-77 (3d Cir. 2005) (affirming rejection of cost offsets because (1) expert report's "summary of direct expenses . . . was sorely lacking in detail, lumping costs into six broad categories with no explanation of what specific expenses those categories represented", (2) defendant failed to proffer documentation, and (3) defendant did not show how "each item of general expense contributed to the production of the infringing items in issue and [did not] offer a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items at issue.").

Although we assume that the court has discretion to award a portion of a claimed expense even if the contemnor's showing for the expense category is deficient, e.g., id. at 176, in this case the size of the deduction claimed -- which represents more than 80 percent of gross profits from the sale of the Fendi-labeled products -- and the absence of data that would permit a reasoned approximation of justifiable cost deductions strongly suggest that the claim should be rejected in toto. See, e.g., Manhattan Industs., 885 F.2d at 8.

_____

injunction and thus was actively seeking to purge its inventory of Fendi-labeled goods (other than perfume). (Mar. 19, 2008 Tr. at 9-11, 13).

B. Shipping Expenses

Mr. Berliner's second cost deduction, for shipping expenses, has the virtue that it targets a specific expense category and identifies a specific allocated cost to account for it. Shipping is a recognized and appropriate expense to deduct, since it unquestionably contributed to the sale of Fendi (and all other) goods sold through Burlington. See, e.g., In Design, 13 F.3d at 565-66 (affirming deduction for shipping goods).

In calculating shipping costs, Mr. Berliner relied on data for three years -- fiscal years 2005, 2006 and 2007 -- which he says yielded shipping expenses (net of vendor rebates and allowances) of 2.3%, 2.6% and 2.0% of "net sales" respectively. (Berliner Decl. at 4, 3 n.8).[17] In justifying his use of the figures from these years for the entire period, he reports that shipping expenses and vendor rebates are not broken out in Burlington's computer database but are included in a "cost of goods" figure reflected in Burlington's Statement of Operations, and that that figure "has remained relatively constant in relation to net sales" for the period 1998 to 2007. (Id. at 4 & n.9). In doing the calculation, he chose the two-percent figure from 2007, as a conservative measure, and

---

[17] Mr. Berliner represents that data for other years was "not available", (Berliner Decl. at 4), though Burlington does not explain why.

29

applied it to the sale of all Fendi-branded goods except for perfumes.[18] By this process, he says -- albeit without elaboration -- he derived an allocated shipping cost of $91,649.00. (Id. at 4).

Burlington's showing suffers from some of the defects cited earlier with respect to the so-called "store expenses." Notably, Burlington does not proffer documentation of the underlying gross shipping costs and does not explicitly provide the method of calculation of this deduction. Nonetheless, as we have observed, the identified category of expense is properly defined and is an appropriate one for deduction in that Burlington obviously must have borne the expense of shipping the Fendi-branded goods from a warehouse to stores. Moreover, although defendants do not explain the unavailability of shipping data for years pre-dating 2005,[19] the calculation appears to reflect conservative assumptions and accordingly the court is justified in exercising its discretion to permit this deduction to be taken.

---

[18] Under the arrangement with Scent of Worth, Burlington was not responsible for the cost of shipping perfume to its stores. (Id. at 3 n.7).

[19] It may well be that this data was available in hard copy even if not in a computer database, and that Burlington chose not to bother to retrieve it.

30

C. Income Taxes

The last deduction sought by Burlington is for income taxes. As we have already noted, the Second Circuit in Sheldon observed that income taxes are not subject to set-off when measuring net profits for purposes of disgorgement, at least if the wrongdoer was a deliberate infringer. Sheldon, 106 F.2d at 53 (citing L.P. Larson, Jr., 277 U.S. at 99-100). Nonetheless, subsequent decisions have recognized that this exclusion is limited to deliberate infringers and have upheld deductions for taxes in the trademark context, e.g., In Design, 13 F.3d at 566-67, and in contempt proceedings. See, e.g., Manhattan Industs., 885 F.2d at 7.

Mr. Berliner calculated taxes based on the average of income taxes paid by defendants from 1998 to 2007. He reports that that average was 38.6% of net pre-tax profits. (Berliner Decl. at 4). Having concluded that the net pre-tax profits on the Fendi-branded goods was $401,397.00, he applied a rate of 38% and determined therefore that the properly allocated taxes were $152,528.00. (Id.).

Fendi does not take specific issue with this calculation. Although the fact that we have not recommended approval of the claimed store expenses as deductions from Burlington's gross

31

profits from Fendi-product sales could arguably complicate the matter of measuring taxes, we see no reason to preclude Burlington from taking this deduction.

## D. Conclusion as to Profits

We therefore recommend that the District Court reduce the award proposed by plaintiffs for the disgorgement of Burlington's gross profits from sales that violated the 1987 consent injunction from $2,772,945.00 to $2,528,768.00 to account for defendants' shipping costs of $91,649.00 and their payment of $152,528.00 in income taxes.

## III. Burlington's Request for Time-Based Exclusions

In its briefing, Burlington offers a set of arguments for the proposition that some portions of its profits from the post-injunction sale of Fendi-branded goods should be excluded from disgorgement based on either Fendi's lassitude in asserting its rights under the 1987 injunction or Burlington's good-faith efforts to comply with that injunction once it received what it contends was belated re-notification of its obligations under that decree. In elaboration of this point, it distinguishes among four periods of time, and says that the offending sales in each should have

32

differing consequences.

The first period defined by Burlington is from 1987 to October 5, 2003. The latter date reflects, somewhat imprecisely, when during the relevant period Fendi first purchased a Fendi-branded item in a Burlington store[20]; according to Burlington, Fendi should then immediately have invoked the 1987 injunction and its right to prevent Burlington from selling Fendi-branded goods. The second period starts on October 5, 2003 and extends to December 22, 2005, when Fendi contacted Burlington to demand, among other things, that it cease selling all Fendi-branded goods, including genuine merchandise based on the 1987 injunction. The third period runs from December 22, 2005 to January 9, 2006, four days after the filing of this lawsuit, when Burlington assertedly first instructed its stores to remove Fendi merchandise -- but not Fendi perfume -- from their shelves.[21] The last period extends to October 10, 2007, when the District Court issued its contempt decision. (Defs.' Offer of Proof at 5-8).

---

[20] Burlington explains that the purchase was actually made on September 23, 2003, but that its record-keeping dictates that it define the transition from the first to the second period as occurring on October 5, 2003. (Defs.' Offer of Proof at 5-6).

[21] There is some minor disagreement between the parties as to when Burlington first took action to remove Fendi products from its stores. (See, e.g., Jan. 4, 2008 letter to the Court from Victor Genecin, Esq., at 3 & Ex. 9 (saying no action was taken by defendants until January 12, 2006)).

In substance Burlington contends that it should not have to disgorge profits earned in violation of the 1987 injunction for the second and third cited periods. In explanation, Burlington asserts that Fendi slept on its rights between October 2003 and December 2005, and that after it belatedly notified Burlington, that company needed some time -- assertedly until mid-January 2006 -- to attempt to remove offending items from the inventory of its many stores and its warehouses. (E.g., id. at 5-7; Mar. 19, 2008 Tr. at 10-13, 16-23).

In some measure these arguments were explicitly or implicitly resolved by the October 10, 2007 contempt decision. As the District Court pointed out, Burlington was on notice of its obligations under the consent injunction from the time of its entry, and yet it took no meaningful steps to ensure its compliance with those provisions. The aim of a disgorgement order is not to punish the contemnor or even to remedy an injury to the plaintiff, but rather to ensure that the contemnor is not unjustly enriched. E.g., King v. Allied Vision, Ltd., 65 F.3d 1051, 1062 (2d Cir. 1995) (citing Manhattan Industs., 885 F.2d at 5). Awarding plaintiff the defendants' profits from their consistent long-term failure to comply with their clear and unambiguous obligations under the injunction would plainly serve that purpose, as the District Court appears to have contemplated in authorizing an award of such

34

profits.

To the extent that Burlington suggests that denying Fendi profits for the period when it purportedly "slept" on its rights and for a period of weeks after Burlington was notified of the injunction but did not take action would serve equity, we disagree.[22] First, both parties entered a nocturnal reverie regarding the injunction, but by virtue of that somnolence, Burlington profited when it was not entitled to do so. Moreover, as the District Court pointed out, if it had complied this entire case would have been unnecessary. In short, although Fendi was obviously sloppy and slow to act, that ought not to justify Burlington

_____

[22] Burlington seems to suggest that certain comments made by the District Court from the bench when denying defendants' motion to reargue on November 5, 2007 support defendants' position on this issue. (Mar. 19, 2008 Tr. at 9-10 (quoting Nov. 5, 2007 Tr. at 13-14)). Again we disagree. The court appeared to indicate that the parties should distinguish between sales made during the period the pre-2006 period, when Burlington was acting negligently and the subsequent period, when its violation was deemed willful (Nov. 5, 2007 Tr. at 13-14), but there was no suggestion in these comments that, simply by virtue of this distinction, Burlington should be relieved of any disgorgement obligation. For reasons noted in the text, we conclude that the circumstances justify disgorgement for the entire period of violation. We note also that distinguishing sales made willfully from those made negligently -- as the District Court mentioned -- may serve two other purposes. First, as noted, if the violation was willful the court is required to make a more searching and skeptical examination of the defendants' showing on assertedly deductible expenses. E.g., Hamil Am., 193 F.3d at 106-07. Second, if the defendants acted willfully, the court may rely on that fact in determining to award attorney's fees and other costs. E.g., Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996); Fendi, 2007 WL 2982295 at *5.

profiting from its own negligence.[23]

Furthermore, insofar as Burlington seeks absolution for the weeks in which, as its counsel memorably puts it, it sought to "turn the battleship around" (e.g., Mar. 19, 2008 Tr. at 10), that argument is still less compelling. Burlington was concededly reminded of the injunction by December 22, 2005 (Defs.' Offer of Proof at 5 & Ex. P), and yet it apparently did virtually nothing until at least January 12, 2006, two and a half weeks after notification and four days after Fendi had filed suit. (Genecin Jan. 4, 2008 letter to the Court, at 3 & Exs. 7-8; Genecin Apr. 4, 2008 Decl. at ¶¶ 12-14 & Exs. D-E). Moreover, even though the company removed non-perfume items from the shelves, it continued not only to countenance, but to advertise and profit by, the sale of Fendi perfume in its stores. (E.g., id. Ex. 11; Decl of Victor Genecin, Esq., executed Apr. 4, 2008 at ¶¶ 18-19 & Exs. D-E). Accord Fendi, 2007 WL 2982295 at *2). In addition, throughout the course of this litigation Burlington drastically understated the scale of its sales of Fendi-branded items until ordered to open its records to Mr. Donohue. (E.g., Donohue Decl. ¶¶ 18-23 & Ex. 4; Genecin Decl. at ¶¶ 7-9). Moreover, it concealed at least some of

---

[23] We also question Burlington's assumption that Fendi knew of the violation of the injunction for two years before taking action. It appears, as was the case with Burlington, that the institutional memory of Fendi was notably defective.

36

its sales activities in merchandising Fendi perfume (Genecin Jan. 4, 2008 letter to the Court at 3-4 & Exs. 11-15), and it engaged in prolonged resistance to being called to account for its violation of the injunction.[24]

Given this record, we see no justification for limiting the scope of the disgorgement relief ordered by the District Court.

## IV. Fees and Costs

In the District Court's contempt decision, it authorized an award of attorney's fees and costs to Fendi. In doing so it observed that Burlington's conduct with regard to the sale of perfume had been willful, thus justifying the award. Fendi, 2007 WL 2982295, at *5 (quoting New York State Nat'l Org. For Women v. Terry, 952 F. Supp. 1033, 1043-44 (S.D.N.Y. 1997) ("It is well settled in this Circuit that costs, including reasonable attorney's fees, may be awarded to the party who prosecutes a contempt motion as an appropriate compensatory sanction for contumacious

---

[24] Apart from drastically understating its sales of Fendi goods, Burlington misstated the state of its records regarding the sale of perfume. (E.g., Donohue Decl. ¶ 19). It also sought to vacate or amend the twenty-year-old consent injunction, and, when denied that relief by the District Court, it sought unsuccessfully to have the Second Circuit reverse that decision. See Fendi Adele S.L.R. v. Burlington Coat Factory Warehouse Corp., 222 Fed. Appx. 25 (2d Cir. 2007). Finally, as noted, it sought unsuccessfully to reargue the sanctions decision.

behavior."")).[25]

Fendi has duly sought such an award. It original application, dated November 19, 2007, requested that it be awarded all fees and disbursements incurred in this litigation, which at the time encompassed fees of $859,310.40 and out-of-pocket expenses of $43,358.61, and reimbursement of what it described as trust account expenses amounting to $26,088.36, or a total of $928,757.37. (Application for Interim Award of Legal Fees and Disbursements at ¶¶ 12-16). It then supplemented that request on March 5, 2008, seeking an additional $350,710.71 in fees. (Mattiaccio Decl. at ¶ 4 & Ex. B).

Defendants have taken issue with the notion that Fendi is entitled to fees and expenses for the entire litigation, as distinguished from an award of such fees and expenses as were generated by its contempt application. (Defs.' Offer of Proof at 8-10). Given this dispute we directed that Fendi provide an alternative accounting of its fees and expenses attributable to the contempt portion of the case. (Mar. 19, 2008 Tr. at 30-31). It did so on April 4, 2008, reporting that fees specifically attributable

---

[25] The court also observed that willfulness was not a prerequisite for such an award, even as it invoked Burlington's willfulness in justifying that relief. Fendi, 2007 WL 2982295 at *5 (citing N.A. Sales Co. v. Chapman Industs. Corp., 736 F.2d 854, 857 (2d Cir. 1984)).

to the contempt proceeding amounted to $478,243.39 and that related disbursements were $154,056.36, most of which represented charges from Fendi's consultant CRA International, Inc., which supplied the services of Mr. Donohue. (Genecin Decl. at ¶¶ 2-5 & Exs. A-C).

In response Burlington still urges that the fees be limited to time spent on the contempt proceeding and also asserts that no fees should be awarded for any work that specifically targeted the pre-2006 violations since the District Court found that Burlington had not acted willfully during that period. (Defs.' Mem. of Law in Opp'n to Fendi's Allocation of Atty. Fees and Disbursements at 1). Defendants also specifically challenge a number of time entries and expense items documented by Fendi's counsel. (Id. at 2-11).

The first question for us is whether the fee award should cover all litigation activity or only the contempt proceeding. Fendi argues principally that the fee award is in the nature of compensation for having to file this lawsuit, since, as the District Court observed, if Burlington had complied with the injunction, no litigation would have followed. It is certainly true that the court in a contempt proceeding has the authority to award the injured party compensatory damages for injuries suffered as a result of the contempt, e.g., Manhattan Industs., 885 F.2d at 5 (citing cases), and it may fairly be argued that the expense of

39

this lawsuit is a direct and injurious consequence of Burlington's contemptuous behavior in selling Fendi-branded goods without permission. Nonetheless, we conclude that a fee-and-cost award at this juncture is properly limited to those expenses triggered by Fendi's contempt claim and its summary-judgment motion for a contempt citation.

The traditional award of fees and costs on a contempt motion is targeted at the expense engendered in seeking relief for the contempt as such. Indeed, the rules of the Southern District governing contempt proceedings contemplate as much. When referring to the relief that may be awarded on a contempt motion, the pertinent rule states that "[a] reasonable counsel fee, necessitated by the contempt proceeding, may be included as an item of damage." S.D.N.Y. 83.9(a). This language reflects the notion that the fee award is ordinarily designed to reimburse the plaintiff for expenses pertinent to obtaining a contempt citation. Furthermore, it bears mention that in deciding whether to award fees, the courts typically look -- as was the case here -- to whether the contempt was willful even though willfulness is not a prerequisite to such an award. See, e.g., Weitzman, 98 F.3d at 719. The relevance to a fee award of that state-of-mind inquiry -- which is not usually undertaken in deciding whether to award the plaintiff compensation for injury from the contemnor, see, e.g.,

Manhattan Industs., 885 F.2d at 5 (compensation award appropriate
for non-willful contempt)(citing inter alia Canterbury Belts Ltd.
v. Lane Walker Rudkin Ltd., 869 F.2d 34, 39 (2d Cir. 1989)) --
further suggests that simply because a plaintiff is compelled to
obtain a contempt citation and thus inevitably to bear some expense
in doing so does not mean that a case-wide fee award should be
granted as in the nature of compensatory damages. Fee awards, while
conceptually compensatory, do not necessarily follow from the
necessity for litigation.

It also bears emphasis that in this case an award of fees at
this stage for all litigation to date is particularly
contraindicated because of the nature of the claims plaintiff
advances and the potential for full and adequate relief if the
balance of the lawsuit is successful. Plaintiff asserts claims for
the marketing by Burlington of counterfeit Fendi goods. (Compl. at
¶¶ 47-87). Indeed, much of the litigation has been specifically
addressed to those claims, which, if upheld, will yield both
trebled profits or damages (whichever is greater) and attorney's
fees. 15 U.S.C. §§ 1117(a) & (b). See, e.g., Fendi S.A.S. Di Paola
Fendi E Sorelle v. Cosmetic World, Ltd., 642 F. Supp. 1143, 1147
(S.D.N.Y. 1986). The non-contempt claims now being pursued by
Fendi, if validated, will thus assure full compensation for
plaintiffs' expenses of the non-contempt portion of the litigation.

If, on the other hand, the counterfeiting claims prove not to be valid, Fendi will not be compensated for the expense of that portion of the lawsuit, nor should it be. Hence it would be inappropriate to compensate Fendi now for that aspect of the litigation simply as an adjunct to the contempt proceeding.

In seeking to further limit the fee award in this case, Burlington argues that fees may be awarded only if the contemnor is found to have acted willfully, and it therefore suggests that any attorney services directed at the sale of Fendi-labeled goods pre-dating 2006 should not be compensated because the violations for that period have been found to constitute only negligent conduct. (Defs.' Supp. Mem. of Law at 5 (citing inter alia Manhattan Industs., 885 F.2d at 8). This argument cannot be sustained.

The panel in Manhattan Industries does not squarely say, much less hold, that absence of willfulness by the contemnor disqualifies a plaintiff from a fee recovery, and the Second Circuit has more recently stated that willfulness may not be a prerequisite for a fee award against a contemnor. See Weitzman, 98 F.3d at 719 (discussing cases).[26] Indeed, the suggestion in Weitzman

---

[26] As recently as last year a panel of the Second Circuit indicated that, despite some arguable dicta in two prior decisions, the Circuit Court had not determined that willfulness was a sina qua non for a fee award. See Jacobs v. Citibank, N.A., 2008 WL 2474636, at *2 & n. 3 (2d Cir. June 18, 2008)(discussing

42

that willfulness is not necessary for an award, particularly if the contempt is clear, has been followed in a number of well-reasoned decisions in this district. See, e.g., Shady Records, Inc. v. Source Enter., 351 F. Supp.2d 64, 67 (S.D.N.Y. 2004). Accord Mingoia v. Crescent Wall Sys., 2005 WL 991773, at *4 (S.D.N.Y. Apr. 26, 2005). As noted in Shady Records, denial of fees in a contempt proceeding perversely leaves the victim of the contempt "worse off for its efforts to secure compliance with its rights and the court's command", whereas the availability of fees encourages the beneficiary to monitor compliance. 351 F. Supp.2d at 67. Accord Sizzler Family Houses v. Western Sizzler Steak House, Inc., 793 F.2d 1529, 1535 (11th Cir. 1986). In this case, the extreme and extended nature of the violations, Burlington's persistence in violations after a reminder of the consent injunction, and its subsequent resistence to full disclosure and enforcement during the course of the lawsuit fully justify an award of fees for all aspects of the contempt proceeding.

Given these parameters, there remains the task of determining the actual amount of the fee-and-cost award based on the fees and other costs generated by the contempt proceeding. Although ordinarily when faced with a fee application we would assess it under well-established legal criteria formerly labeled as a

inter alia Weitzman, 98 F.3d at 719; King, 65 F.3d at 1063).

"lodestar" analysis of the hourly rate and amount of time claimed,[27] in this case Burlington has limited itself to challenging a series of specified time entries of Fendi's counsel either as unrelated to the contempt proceeding or else as reflecting unnecessary time and duplication of effort. (Defs.' Mem. of Law In Opp'n to Fendi's Allocation of Fees and Disbursements at 2-11). Since Fendi has chosen not to try to defend these entries[28], our remaining task on this portion of Fendi's application is mostly arithmetical.

Fendi asked for an award of $478,243.39 in fees. (Genecin Decl. at ¶ 4 & Ex. A). Burlington has challenged ten sets of time entries in their entirety as either unrelated to the contempt claim or else undocumented because of redactions in the pertinent time records. (Defs.' Mem. of Law in Opp'n to Fendi's Allocation of Fees and Disbursements at 4-5, 6-7, 8, 9-11). These include (1) Fendi's preparation of a motion, never filed, for a temporary restraining

---

[27] The Second Circuit has recently suggested that this terminology be dropped and the methodology slightly altered. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 188-90 (2d Cir. 2008). See also Lucky Brand Dungarees, Inc. v. Ally Apparel Res., LLC, 2009 WL 466136, *1-2 (S.D.N.Y. Feb. 25, 2009).

[28] In defendants' original "Offer of Proof" they challenged a smaller universe of time entries (Defs.' Offer of Proof at 10), and Fendi responded by explicitly waiving any opposition to those challenges. (Mattiaccio Mar. 6, 2008 letter to the Court at 2). Defendants later expanded the scope of their attacks on specific time entries (Defs.' Mem. of Law in Opp'n to Fendi's Allocation of Fees and Disbursements), and Fendi has not sought to respond to these objections.

44

order and preliminary injunction ($1,101.25 in fees), (2) Fendi's preparation of a Reply to Burlington's counterclaims ($5,414.00), (3) unspecified legal research ($5,384.00), (4) preparation of a response to a motion by Burlington for partial summary judgment ($2,107.50), (5) preparation of a letter concerning settlement of the case ($225.60), (6) unspecified legal research and review of documents ($2,019.00), (7) preparation of a stipulation of confidentiality ($1,515.00), (8) attendance at a May 2, 2007 conference ($940.00), (9) unspecific time entries for general research and discovery ($42,689.00), and (10) time spent on assorted discovery disputes ($7,460.00). Striking these entries reduces the fees claimed by $67,855.35.

Burlington also challenges, at least in part, six sets of time entries, some of which involved tasks that mostly, though not entirely, concerned non-contempt issues. The other challenged entries involved court appearances that, according to Burlington, were overstaffed by Fendi's counsel. Defendants seek either elimination of these charges or else reductions in unspecified amounts. (Id. at 2-4, 5-6, 7-8, 9). Since each entry involved at least some work on the contempt claim and since Fendi has not taken a position on the size of any reduction that might be justified, we choose to make our own, admittedly impressionistic, adjustments, as follows: (1) drafting of a cease-and-desist letter ($4,737.50 -

45

$3,000.00 = $1,737.50), (2) preparation of the original and amended complaints ($8,086.50 - $6,000.00 = $2,086.50), (3) participation in oral arguments before the District Court and the Court of Appeals on Burlington's motion to amend the injunction ($7,026.25 - $2,000.00 = $5,026.25), (4) participation in the June 5, 2007 oral argument on Fendi's summary-judgment motion ($3,952.50 - $1,000.00 = $2,952.50), (5) participation in the November 5, 2007 oral argument on Burlington's motion to reconsider ($8,588.75 - $3,000.00 = $5,588.75), and (6) participation in a January 31, 2008 conference concerning Fendi's sanctions application ($8,139.25 - $3,000.00 = $5,139.25). Therefore, the fees claimed by Fendi for these activities should be reduced by $22,530.75.

The reductions from Fendi's April 2008 adjusted fee application thus total $90,386.10. Since Burlington advances no other challenges to the size of Fendi's fee and cost application, we conclude that plaintiffs should be awarded $387,857.29 in fees ($478,243.39 - $90,386.10) and $154,056.36 in expenses, or a total of $541,913.65.

## V. Pre-Judgment Interest

Fendi also seeks an award of pre-judgment interest on the profits earned by Burlington and subject to disgorgement. It

46

proffers, as part of the report of Mr. Donohue, a calculation of such interest through March 1, 2008 based on an assumed disgorgement figure of $2,794,290.00 and premised on the New York statutory interest rate of nine percent. (Donohue Decl. at ¶ 57). Burlington does not explicitly oppose this application, and we conclude that an award is appropriate, although not in the amount sought by Fendi.

The award of pre-judgment interest as an accompaniment to an order of disgorgement is discretionary with the court, although it is consistent with the underlying rationale for disgorgement, which, as noted, is designed to avoid any unjust enrichment by the defendants. See, e.g., SEC v. First Jersey Secs. Inc., 101 F.3d 1450, 1476 (2d Cir. 1996); SEC v. Haligiannis, 470 F. Supp.2d 373, 385 (S.D.N.Y. 2007). Moreover, that rationale applies in the contempt context. See, e.g., Goya Foods, Inc. v. Wallach Mgt. Co., 344 F.3d 16, 20 (1st Cir. 2003). In this case Burlington has been selling Fendi-branded products without authorization since 1993, thereby earning a profit, and has therefore had the unjustified use of that money for some period of time, to its ultimate financial benefit. That benefit is properly subject to disgorgement as well, which may be accomplished by an award of interest.[29]

---

[29] Burlington might be heard to argue that Fendi's delay in asserting its rights under the injunction should weigh against an award of interest. Apart from the fact that defendants have not

As for the appropriate interest rate, that should be set in accordance with the rate established for non-payment of federal taxes, see 26 U.S.C. § 6621(a)(2), as is typically done for disgorgement awards in comparable federal statutory cases. See, e.g., First Jersey Secs., 101 F.3d at 1476. This rate reasonably approximates the savings to Burlington from obtaining what was, in effect, an interest-free loan. Id. at 1476-77.[30]

In all other respects, we adopt the methodology utilized by Mr. Donohue, although it must be applied to the disgorgeable profits as we have found them.

## VI. Coercive Sanctions

The remaining issue before us in connection with the contempt motion concerns Fendi's request for coercive sanctions to deter Burlington from continuing to violate the 1987 injunction. (Pls.' Mem. of Law in Support of Additional Contempt Sanctions). At one

---

advanced such an argument, it is unpersuasive since Burlington itself failed to comply for many years with the injunction and, as between the two companies, is less justified in claiming the financial gain that accrued from its prolonged violations.

[30] The nine-percent rate pressed by plaintiffs is divorced from the economic realities that should be the guide in circumstances of this sort. Cf. First Jersey Secs., 101 F.3d at 1476-77 (rejecting use of treasury-bill rate because it reflects the rate that the investor obtains by lending to the Government rather than the rate he would pay to borrow from the Government).

point Fendi urged a forward-looking fine of $10,000.00 per violation (see, e.g., Jan. 15, 2008 letter to the Court from Richard L. Mattiaccio, Esq. at 2), though in its more formal submission it left the nature of the sanction to the court's discretion. (Pls.' Mem. in Support of Additional Contempt Sanctions at 5).[31] The premise for this request is Fendi's showing that even after the issuance of the District Court's contempt decision, some Burlington stores were continuing to hold at least small quantities of Fendi perfume on their shelves for public purchase. (E.g., Decl. of James J. Donohue, executed Feb. 21, 2008 at ¶¶ 3-4; Mattiaccio Jan. 15, 2008 letter to the Court at 2; Genecin Jan. 4, 2008 letter tot he Court at 4-5; Parilla Decls. executed Oct. 22, 2007 & Dec. 18, 2007; Mattiaccio Jan. 24, 2008 letter to the Court at 2-4).

Burlington's argument in opposition reduces to the assertion that it has done the best that it could to police its own stores, that Fendi has not suggested any measures that would entirely alleviate the problem and that the difficulties in achieving complete compliance were short-term and were unlikely to recur

---

[31] Fendi's position has shifted over time. Initially it sought an award of $10,000.00 per violation for sales disclosed between October 10, 2007 and early 2008, or a total of $2 million. (See Jan. 24, 2008 letter to the Court from Richard L. Mattiaccio, Esq. at 4). Later it asked for an immediate award of $100,000.00 for consultant's fees and fines of $1,000.00 for each future violation. (See Jan. 30, 2008 letter to the Court from Richard L. Mattiaccio, Esq.).

except in very isolated fashion. (E.g., Dec. 27, 2007 letter to the Court from J. Joseph Bainton, Esq.; Jan. 23, 2008 letter to the Court from J. Joseph Bainton, Esq.; Jan. 25, 2008 letter to the Court from J. Joseph Bainton, Esq.; Decl. of Stacy J. Haigny, executed Mar. 14, 2008, at ¶¶ 3-18). In this regard defendants explain that the bottles of perfume discovered by Fendi representatives weeks or months after October 10, 2007 were probably customer returns that were innocently placed back on the shelves of the retailer by unknowing floor staff, and in one instance they claim that there was a computer error. Defendants argue that these errors were de minimis -- both in numbers and in profits earned -- and that they have done all that they reasonably could to police the matter since Burlingotn does not keep the perfume on its inventory records. Accordingly defendants urge that no coercive sanctions are warranted. (E.g., Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Additional Contempt Sanctions at 1-8).

The court has discretion to impose coercive sanctions on the contemnor if it foresees a reasonable prospect of future violations. The nature of the sanction is also discretionary and need only be reasonable in light of the circumstances. See, e.g., Nat'l Org. For Women, 886 F.2d at 1353; SEC v. Zubkis, 2003 WL 22118978, at *4 (S.D.N.Y. Sept. 11, 2003). In this case it appears that the violations noted by Fendi were scattered and not part of

50

any evident pattern of active resistance by defendants to compliance with their obligations under the injunction. Nonetheless, given the fact that these violations occurred on a number of occasions, that others may well have taken place beyond the surveillance of Fendi, and that Burlington does not explain why it cannot impose a reasonable inventory-based surveillance system, we question the care and aggressiveness with which Burlington has policed its own personnel. To put it another way, we are satisfied that plaintiffs have demonstrated clearly and convincingly that Burlington has not acted with due diligence, especially in the wake of the specific findings by the District Court as to the nature and extent of their obligations under the consent injunction. We therefore view it as appropriate to recommend a forward-looking sanction, albeit one more modest than that proposed by Fendi, to apply to any further violations, in the form of a $1,000.00 fine for each future proven violation. In combination with the expense of any future contempt proceedings, as well as the availability of other contempt sanctions, this should suffice to deter further violations by defendants, whether deliberate or simply negligent.

## CONCLUSION

For the reasons noted, we recommend that the District Court award plaintiffs $2,528,768.00 as disgorgement of Burlington's

51

profits from sales that violated the 1987 consent injunction, $541,913.65 in attorney's fees and costs, and pre-judgment interest at the rate set under 26 U.S.C. § 6621(a)(2). We further recommend that the court impose fines of $1,000.00 per violation for any future sales by defendants in violation of the 1987 consent injunction.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Leonard B. Sand, Room 1650, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: **New York, New York**
       **April 27, 2009**

                          **RESPECTFULLY SUBMITTED,**

                          **MICHAEL H. DOLINGER**
                          **UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been mailed
this date to:

Richard L. Mattiaccio, Esq.
Squire Sanders & Dempsey L.L.P.
350 Park Avenue
15th Floor
New York, New York 10022-6022

J. Joseph Bainton, Esq.
Bainton McCarthy LLC
26 Broadway
Suite 2400
New York, New York 10004-1840