UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FENDI ADELE S.R.L., FENDI S.R.L., and
FENDI NORTH AMERICA,

        Plaintiffs,

              v.


BURLINGTON COAT FACTORY
WAREHOUSE CORP. et al.,

        Defendants/Third Party Plaintiffs,


              v.

546332 BC, Ltd., d/b/a/ COLTON
INTERNATIONAL, SUMMIT RESOURCES
IMPORTS LLC, EURO MODA, INC., MODA
OGGI, INC., and ASHLEY REED
TRADING, INC.,

        Third Party Defendants.

**MEMORANDUM AND ORDER**
No. 06 Civ. 85 (LBS)

SAND, J.

       In this Court's 2007 opinion, *Fendi Adele S.R.L. v. Burlington Coat Factory*, No.

06 Civ. 85, 2007 WL 2982295 (S.D.N.Y. Oct. 10, 2007), we granted partial summary

judgment in favor of Plaintiffs Fendi Adele S.R.L., Fendi S.R.L., and Fendi North

America (collectively known as "Fendi"), finding Defendants Burlington Coat Factory

Warehouse Corporation and Cohoes Fashion, Inc., a wholly-owned subsidiary of

Burlington Coat Factory, (collectively known as "Burlington") in contempt of this

Court's 1987 Injunction that prohibited Burlington from selling any Fendi-branded

merchandise without written permission from Fendi.[1]  Fendi now moves for summary

judgment on its remaining causes of action.[2]  In addition, three other motions are pending

before the Court: Burlington's Motion to Amend the Answer; Burlington's Motion for

Summary Judgment against the Third Party Defendants; and Colton's Cross-Motion to

Dismiss the Third-Party Complaint.  We will also address Fendi and Burlington's

objections to Magistrate Judge Dolinger's December 1, 2009 Report and

Recommendation.

### I.    Background

Fendi owns the federally-registered Fendi trademarks and is the exclusive

designer of handbags, shoulder bags, purses, wallets and key holders bearing this

trademark.  (Pl.'s 56.1 ¶ 1-2.)  Five Fendi trademarks, each registered with the United

States Patent Trademark Office, are used on their products.  (Pl.'s 56.1 ¶ 68.)  Each of its

products is individually designed, as are the components used, in a complex design

process.  (Pl.'s 56.1 ¶¶ 73-75.)  Fendi manufactures and sells its products in two annual

seasons.  Fendi's authorized customers visit Fendi's showrooms during the Fall and

Spring Fashion Weeks in Milan, view the collection for the season, and place their orders

for specific products in specific quantities.  (Pl.'s 56.1 ¶¶ 77, 84.)

Fendi contracts with small companies in Florence, Italy to assemble the products.

(Pl.'s 56.1 ¶ 97.)  Each assembly order is for a stated quantity of a specific product in a

specific combination of materials.  (Pl.'s 56.1 ¶ 102.)  Fendi gives the sub-contractors a

sixteen digit code for each product.  The code indicates the style number, combination of

materials used, and the season for which the order is manufactured.  (Pl.'s 56.1 ¶¶ 110-

---

[1] The Court's 2007 Opinion provides a full discussion of the lengthy history of this case.  *See Fendi*, 2007 WL 2982295, at *1-3 (S.D.N.Y. Oct. 10, 2007).
[2] Burlington withdrew its cross-motion for summary judgment at oral argument.  (T. at 27.)

11.)  The code is stamped on a piece of leather trim that is sewn into the inside lining of each product.  (Pl.'s 56.1 ¶ 112.)  Fendi monitors the coding of its products by its assembly subcontractors.  (Pl.'s 56.1 ¶ 113.)  As of the Fall-Winter season of 2003, Fendi began stitching a hologram label in the lining of every product.  (Pl.'s 56.1 ¶¶ 117-18.)  When the hologram is placed under a microscope, symbols can be seen within a genuine hologram, permitting it to be identified as authentic.  (Pl.'s 56.1 ¶ 122.)  A specialized vendor manufactures the hologram labels for Fendi; the holograms are delivered to Fendi's manufacturing facility and locked in a safe.  (Pl.'s 56.1 ¶¶ 123-24.)  One hologram is placed in each item, and Fendi tracks the number on each item.  (Pl.'s 56.1 ¶¶ 125-26.)

        Fendi visits its assembly contractors twice a week, monitors their work, and conducts inspections.  (Pl.'s 56.1 ¶¶ 131-33.)  Fendi also conducts inspections of its sub-subcontractors.  (Pl.'s 56.1 ¶ 134.)  Fendi inspects the finished products, and if a product has not been assembled correctly and cannot be repaired, Fendi destroys the product.  (Pl.'s 56.1 ¶ 141.)  The products are then shipped from Fendi's distribution center directly to Fendi's authorized customers.  (Pl.'s 56.1 ¶ 141.)  Each purchaser receives an invoice, which includes Fendi's name, the locations of the corporate offices in Italy, the date the goods were ready for shipment, the name and address of the authorized customer, and the order number assigned to the order.  (Pl.'s 56.1 ¶¶ 147-48.)  The invoice also details the contents of each box and the exact quantity of each style, which is described by Fendi's style number and materials code, and a narrative description of the article.  (Pl.'s 56.1 ¶¶ 149-50.)  Alberto Fabbri, the chief financial officer of Fendi Group,

is able to access the computerized records of all the invoices going back to 2001.  (Pl.'s 56.1 ¶ 152.)

Leonardo Minerva, Industrial Director of Leather Goods and Logistics Director for Fendi, was in charge of the manufacturing of the products from September 2002 to March 2008.  (Pl.'s 56.1 ¶ 154.)  As part of his duties, Minerva, along with his assistant, Massimo Lepri, examined hundreds of questioned Fendi-branded items each year for authenticity.  (Pl.'s 56.1 ¶¶ 155-60.)  Fendi has a multi-step process to determine whether an item is genuine, which involves: (1) visually inspecting the physical characteristics of the item, such as the quality of the materials, the purported Fendi trademark, the finishing, the metallic hardware, and the way the product was manufactured; (2) checking the item against Fendi's records to determine whether the particular style has been manufactured using the correct combination of materials; (3) inspecting each of the components for conformity with Fendi's specifications; (4) examining the sixteen digit code stamped on the leather trim inside the lining to determine if it matches Fendi's internal manufacturing and design records; and (5) examining the hologram for genuineness and checking the serial number on the hologram label to see if it matches Fendi's records.  (Pl.'s 56.1 ¶¶ 157-65.)

At his deposition, Minerva testified that he never saw an instance in which a Fendi-branded item had correct codes but imperfect material.  (Pl.'s 56.1 ¶ 117.)  Minerva testified regarding forty three Fendi-branded items that were either sold by Burlington or that were selected from their inventory during discovery.  These inspections were conducted by Minerva and his assistant Lepri.  (Pl.'s 56.1 ¶ 166; Def.'s Response to 56.1 ¶ 166.)  Minerva testified that thirty nine of the items were counterfeit,

and three items were genuine Fendi products.  (Pl.'s 56.1 ¶¶ 166-68.)  Burlington's

principal sources for Fendi-branded handbags and small leather goods were: 546332 BC,

Ltd. d/b/a/ Colton International ("Colton"); Eura Moda, Inc. ("Euro Moda"); Moda Oggi,

Inc. ("Moda Oggi"); Summit Resources LLC ("Summit"); and Ashley Reed Trading, Inc.

("Ashley Reed") (collectively known as the "Vendors"). (Pl.'s 56.1 ¶ 187.)  Colton,

Moda Oggi, Summit and Ashley Reed have never been customers of Fendi.  (Pl.'s 56.1 ¶

189.)  In 2002 and 2003, Euro Moda made occasional purchases in small quantities of

Fendi-branded items from an outlet store operated by Fendi.  (Pl.'s 56.1 ¶ 189.)

Minerva did not inspect any Fendi-branded goods supplied by Ashley Reed to Burlington

but testified that he, along with Lepri, inspected twenty Fendi-branded items supplied by

Ashley Reed to Filene's Basement, Big M, Inc., Nordstrom's Rack and Saks Off Fifth.

(Pl.'s 56.1 ¶ 190.)  Minerva testified that the items supplied by Ashley Reed were

counterfeit.  (Pl.'s 56.1 ¶ 190.)

On April 12, 2004, Stacy Haigney, Burlington's in-house counsel since 1990, met

with counsel for Louis Vuitton Malletier, a company that has the same ultimate

ownership as Fendi, to attempt to settle a trademark infringement litigation brought

against Burlington.  (Pl.'s 56.1 ¶ 204; Haigney Dec. ¶ 4, 13.)  At the negotiations, counsel

showed Haigney a Fendi-branded handbag that had been purchased from Burlington and

informed Haigney that the handbag was counterfeit.  (Pl.'s 56.1 ¶ 215.)  Haigney

requested that counsel send him a formal letter to that effect.  (Def.'s Response to 56.1 ¶

215.)  Haigney confirmed that Colton had supplied the bag to Burlington and contacted

counsel for Colton regarding the handbag.  (Pl.'s 56.1 ¶¶ 216-17.)  In late April 2004,

Haigney received a letter on behalf of Fendi, which formally placed Burlington on notice

that it was selling counterfeit branded goods and demanded that it cease and desist. (Pl.'s 56.1 ¶ 218; Haigney Dec. ¶ 18.) During the ensuing months, Fendi engaged in correspondence with Colton regarding the allegedly counterfeit bag. (Haigney Dec. ¶ 19.) On August 4, 2004, Colton sent a fax to Haigney containing a copy of an unsigned letter in Italian, purportedly from Minerva, together with an English translation stating that Fendi had examined the handbag and found that it had been made by Fendi and was within Fendi's standards of quality. (Pl.'s 56.1 ¶ 229.) Fendi challenged the authenticity of the letter. (Def.'s Response to 56.1 ¶ 232.) On December 23, 2005, Haigney received another cease and desist letter from Fendi, which alleged that all of Burlington's Fendi products were counterfeit and sold in violation of the 1987 Injunction. (Pl.'s 56.1 ¶ 275; Haigney Dec. ¶ 36.) Fend-branded items were still on Fendi's shelves as late as March 2008. (Pl.'s 56.1 ¶ 21.) This Court's 2007 Opinion found Burlington in contempt, granted Fendi's motion for an accounting and disgorgement of profits, and awarded Fendi costs and attorney's fees.

## II.    Fendi's Motion for Summary Judgment

A court may only grant a motion for summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court looks to the substantive law to identify which facts are material; only disputes over facts that might affect the outcome of the suit under the governing law will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kinsella v. Rumsfeld*, 320 F.3d 309, 311 (2d Cir. 2003). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;

the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). An issue is genuine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Id.* at 149-50.

Where the moving party would ultimately bear the burden of persuasion at trial, the moving party must make a *prima facie* showing with credible evidence that there is no genuine issue of material facts for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the moving party successfully makes such a showing, the burden of production shifts to the non-moving party to submit evidentiary materials demonstrating the existence of a genuine issue. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 331. "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). The court must draw all inferences in favor of the non-moving party. *Id.*

### a. Admissibility of Minerva's Testimony

As a preliminary matter, we must determine whether or not Leonardo Minerva's deposition testimony is admissible. Burlington alleges that his testimony should be excluded because (1) Minerva lacked personal knowledge of the contents of the authenticity reports and (2) Minerva relied on the reports throughout the course of his deposition. [3]

---

[3] Burlington argues for the first time in its Surreply that Minerva's testimony is inadmissible because Fendi failed to produce a written expert report as required by Federal Rule of Civil Procedure 26. Rule 26(a)(2)(B) requires written reports "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert

The district court has broad discretion to determine whether a witness is using a writing to refresh his or her memory or is offering the writing for the truth of something the witness can no longer recall. *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 93 n.17 (2d Cir. 1984); *Doty v. Elias*, 733 F.2d 720, 725 (10th Cir. 1984); *United States v. Conley*, 503 F.2d 520, 522 (8th Cir. 1974). The court must ensure that the witness actually has a present recollection and that evidence, which would otherwise be inadmissible, does not inadvertently slip in for its truth. *20th Century Wear*, 747 F.2d at 93 n.17. In order to safeguard against this risk of prejudice, Federal Rule of Evidence 612 permits opposing counsel to inspect the writing used, cross-examine the witness on it, and introduce portions into evidence. Fed. R. Evid. 612; *see also 20th Century Wear*, 747 F.2d at 93 n.17.

Burlington's allegation that Minerva had no recollection to refresh is without merit. Minerva testified that he had been conducting authenticity inspections for over four years. (Genecin Dec. Ex. 31 ("Minerva Dep.") at 12:21-24.) He described in detail the procedures Fendi has in place to protect the authenticity of its goods and identify counterfeit products. Minerva described the kits provided to sub-contractors, the codes that were placed on the products, the precise specifications of the distance between the "Fs" on Fendi fabric, the type of metal that was used for the hardware, and the manner of

---

testimony." Fed. R. Civ. P. 26(a)(2)(B). The "structure of Rule 26(a)(2)(B) provides a clear distinction between the retained class of experts and the unretained class of experts." *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 182 n.13 (2d Cir. 2004) (*quoting Kent v. Katz*, No. 99 Civ. 189, 2000 WL 33711516, at *1 (D.Vt. Aug. 9, 2000). Burlington does not acknowledge the limited applicability of Rule 26(a)(2)(B), and even if Minerva qualifies as an employee who regularly gives expert testimony, the testimony of an expert need not be excluded if the error is harmless. Fed. R. Civ. P. 37(c); *see Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006). Prior to Minerva's testimony, Fendi produced the authentication reports that Minerva relied on in his testimony. These reports provided Burlington with the opinions he would express, the data or other information he considered, the exhibits that he would use, and Minerva's title of employment at Fendi. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)-(iv). Any failure to produce a formal written expert report was harmless error.

quality inspection that occurred when Fendi received the assembled products. (Minerva Dep. at 35:10-17.) Minerva testified that his assistant Massimo Lepri generally prepared the reports, and then Minerva reviewed the reports, discussed them with Lepri, and sometimes made corrections. (Minerva Dep. at 337:23-338:10). After Lepri signed the report, Minerva would sign the report. Nothing in Minerva's testimony suggests that he ever signed an authenticity report without conducting an inspection.[4] Minerva's supervision and review of the reports is sufficient to establish personal knowledge, regardless of the fact that Lepri conducted the initial inspection and drafted the reports. *See United States v. Muhammad*, 120 F.3d 688, 699 (7th Cir. 1997) ("[A]lthough Agent Gandolfo prepared the FBI 302 covering Muhammad's interview, [Agent Denny] reviewed that report for accuracy, made corrections to it, and signed it. In essence, the report was that of both Agent Gandolfo and Agent Denny.")

Furthermore, Minerva was entitled to consult the reports throughout his testimony. Courts have permitted witnesses to rely on notes or documents throughout the course of testimony if the witness demonstrates an independent recollection, and the testimony is of a detailed nature. *See United States v. Rinke*, 778 F.2d 581, 588 (10th Cir. 1985) (finding that the witness was properly allowed to read from his notes where he had established an independent recollection by embellishing on the notes and testifying regarding subjects that were not explicitly contained in the notes regarding specific content of telephone conversations); *United States v. Riccardi*, 174 F.2d 883, 889 (3d Cir.

---

[4] Burlington's allegation that Minerva only reviewed fifty percent of Lepri's authentication reports misstates Minerva's testimony. (Def.'s Opp. Summ. J. 7.) As one part of the authenticity inspection, the distance between the two F's on the fabric is measured to see if it is in compliance with Fendi's standards. Lepri would conduct this measurement and include it in his report; Minerva, upon reviewing the report, would check this measurement at least fifty percent of the time, sometimes more, depending on how many reports he had to review. (Minerva Dep. at 332:18-333:13.) This specific measurement is the only aspect of the inspection that Minerva testified he sometimes checked only fifty percent of the time.

1949) (trial judge did not err in permitting a witness to read a list of chattel because he "immediately recognized that the items of property involved were so numerous that in the ordinary course of events no one would be expected to recite them without having learned a list by rote memory").[5]

Minerva demonstrated an independent recollection by going beyond the scope of the reports. Minerva identified a manufacturing number, which had once been a real Fendi number, but was now repeatedly found on counterfeit goods. (*See e.g.*, Minerva Dep. at 73:3-18.) He also pointed to a hologram that was peeling off of a product, while a genuine Fendi hologram is not detachable. (Minerva Dep. at 72:18-73:2.) Throughout Minerva's testimony, he compared counterfeit bags with genuine bags, describing the differences. (*See e.g.*, Minerva Dep. at 192:23-194:7.) Furthermore, the nature of Minerva's testimony was highly detailed. He provided testimony regarding approximately sixty counterfeit products. For each item he identified multiple deviations, which demonstrated that the products were counterfeit. In addition, each product involved deciphering the legitimacy of a sixteen digit code. Given the fact that Minerva did not rely exclusively on the reports and that the nature of the testimony was detailed, we find his use of the reports was proper.[6]

---

[5] *See also* S. Broun, McCormick on Evidence § 9 (6th ed. 2009) ("[E]ven if a witness recognizes from present memory the correctness of a set of facts recorded in a memorandum, the witness may be unable to detail those facts from memory without consulting the writing. Accordingly, the generalization that, once refreshed, a witness must speak independently of the writing is too inflexible. Again, the matter ought to be entrusted to the trial judge's discretion. The judge may permit the witness to consult the memorandum as she speaks, especially when it is so lengthy and detailed that even a witness with a fresh memory would realistically be unable to recite all the items unaided.").

[6] Any prejudice to Burlington, as a result of Minerva's reliance on the reports, was mitigated by Burlington's ability to cross-examine Minerva and attack his credibility. *See 20th Century Wear*, 747 F.2d at 93 n.17 (noting that the courts and Congress have devised two safeguards to protect against the admission of inadmissible evidence for its truth: (1) the broad discretion of the trial judge; and (2) the right to inspect whatever is used to refresh the witness's recollection, to cross-examine the witness, and to introduce into evidence relevant portions); *Rinke*, 778 F.2d at 588 ("[The witness's independent recollection], coupled with the opportunity defense counsel had to cross-examine Pieper and/or to introduce

### b. Liability

#### i. Trademark Infringement and False Designation of Origin

Fendi's first two claims allege counterfeiting in violation of 15 U.S.C § 1114(a) and false designation of origin in violation of 15 U.S.C. § 1125(a). To prevail on these claims, Fendi must successfully establish that: (1) it had a valid mark entitled to protection under the Lanham Act; and (2) Burlington used a similar mark in commerce in a way that would likely cause confusion among the relevant consuming public. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114-15 (2d Cir. 2006); *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996).

First, the Court must determine whether Fendi had a valid mark entitled to protection under the Lanham Act. Each of the five trademarks used on the products at issue is registered in the U.S. Patent and Trademark office. (Pl.'s 56.1 ¶ 68.) Under the Lanham Act a "certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark . . . ." 15 U.S.C. § 1057(b). In an action for infringement of a registered mark, "the defendant bears the burden to rebut the presumption of the mark's protectibility by a preponderance of the evidence." *Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). As we previously noted, both the FENDI and FF monogram trademarks have been extensively advertised and are now regarded as prestigious symbols in fashion. *Fendi S.a.s. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd.*, 642 F. Supp. 1143, 1145

---

the notes into evidence and attack Pieper's credibility vitiates the prejudice, if any, to the defendants when the court allowed Pieper to rely on his notes while testifying.").

(S.D.N.Y. 1986). Burlington has put forth no evidence to challenge the validity of the registered trademark; rather, Burlington brings a counterclaim to cancel Fendi's trademarks under a naked licensing theory. Burlington contends that Fendi has abandoned its rights to the marks. Burlington offers evidence that Fendi's assemblers were selling non-conforming bags directly from the manufacturers and that Fendi does not always act in conformity with its quality control measures. Specifically, Burlington alleges that a witness saw a bolt of fabric in an assembly warehouse, which should not exist in the one kit per bag assembly procedure.

A "naked license" is a license to use a trademark without sufficient quality control provided by the licensor. Under the naked licensing doctrine, a naked licensor may be estopped from challenging a breach of a licensing agreement, or even be deemed to have involuntarily abandoned the rights to the mark. *See E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000), *aff'd*, 4 Fed. Appx. 81, 2001 WL 170455 (2d Cir. 2001) ("A licensor must exercise some degree of supervision over the licensee on pain of abandonment of the mark."). The parties agree that the assembly subcontractors were not licensees and were contracted to do no more than assemble Fendi products. (Pl.'s 56.1 ¶¶ 97-98; Def.'s Response to 56.1 ¶¶ 97-98.) To succeed on a "naked licensing" abandonment claim, Burlington must meet a "high burden of proof." *Patsy's Italian Restaurant v. Banas*, 508 F. Supp. 2d 194, 212 (E.D.N.Y. 2007) (*citing Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983)). Burlington has failed put forth actual evidence of back door dealings.[7] Nor is one witness observing a

---

[7] The testimony Burlington puts forth does not support its allegations. (Def.'s Opp. Summ. J. 25-26.) At Scott Ressler's deposition, he did not testify that he purchased goods directly from Fendi manufacturers. He testified that he purchased St. John's merchandise directly from the manufacturers but did not remember ever purchasing Fendi merchandise directly from the manufacturer. (Castellano Dec. Ex. 1

bolt of fabric sufficient to demonstrate that Fendi has abandoned its mark.  Based on the ample record showing Fendi's comprehensive control mechanisms, allegations of isolated incidents of non-compliance with those mechanisms is insufficient to support a naked licensing theory.  Burlington's counterclaim is denied, and we find that Fendi has a valid trademark.

The second inquiry under the Lanham Act is whether there was a likelihood of confusion.  To determine whether there is a likelihood of confusion, courts in the Second Circuit generally rely on the eight-factor test set forth in *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495-96 (2d Cir. 1961).  However, where counterfeit marks are involved, the court need not engage in a *Polaroid* analysis because "counterfeit marks are inherently confusing." *Chloe v. DesignersImports.com USA Inc.*, No. 07 Civ. 1791 (CS), 2009 WL 1227927, at *6 (S.D.N.Y. Apr. 30, 2009); *Gucci Am., Inc. v. Tyrrell-Miller*, No. 08 Civ. 4760, 2008 WL 7400139, at *2 (S.D.N.Y. Nov. 19, 2008).  To find a likelihood of confusion, a court need only determine that the items at issue are counterfeit and that the defendant distributed, offered for sale, or sold the items. *Gucci Am., Inc. v. Duty Free Apparel*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003).  Burlington does not dispute that the goods at issue were taken from its warehouse; therefore, the Court need only determine if the goods were counterfeit.

Minerva, the Industrial Director of Leather Goods and Logistics Director for Fendi from 2002 to 2008, testified that thirty nine of the Fendi-branded products taken from Burlington were counterfeit.  He also identified twenty Fendi-branded products Ashley Reed supplied to other retailers as counterfeit.  Minerva found numerous

---

("Ressler Dep.") at 433-34). Colton testified that he purchased goods on two occasions from a Fendi outlet, and on one of those occasions all he purchased was a cashmere Fendi blanket for his home.  (Castellano Dec. Ex. 2 ("Colton Dep.") at 55-57.)

deviations for each counterfeit product, including falsified holograms, peeling holograms, improper coding, inferior materials, improper hardware, non-conforming fabric, and combinations of colors and hardware not used in genuine Fendi products. Minerva's testimony establishes a *prima facie* case that the goods at issue are counterfeit. *See Motorola, Inc. v. Abeckaser*, No. 07 Civ. 3963 (CPS), 2009 WL 962809, at *5 (E.D.N.Y. Apr. 8, 2009) (finding that the plaintiff had made *prima facie* case based on the quality manager's findings of inferior quality, poor affixation of the marks on the products, inconsistency of the materials used with those used to make genuine goods, and the inconsistency in the packaging on the counterfeit goods); *Duty Free America*, 286 F. Supp. 2d at 288 (finding *prima facie* case established based on plaintiff's expert testimony, which identified several deviations in each of the items at issue).

Burlington has failed to provide any evidence to defeat Fendi's *prima facie* case and establish the existence of a genuine issue as to the authenticity of the goods in question. Burlington has not offered a countervailing expert, evidence that any of the goods in question were purchased from an authorized Fendi customer, or any other affirmative evidence that the bags are genuine. *See Duty Free Apparel*, 286 F. Supp. 2d at 289 ("It is notable that Harvest Wrap failed to produce any affirmative evidence that the items in evidence are actually authentic, either through an expert or through an explanation of their origins."). Rather, Burlington offers evidence that Fendi goods are available from sources other than Fendi.[8] Burlington also notes that it, along with Ashley

---

[8] The bolts of fabric in the warehouse, which Burlington claims challenges the credibility of Fendi's procedures, does not raise a genuine issue as to the authenticity of the goods. In *Gucci v. Duty Free Apparel*, 286 F. Supp. 2d 284 (S.D.N.Y. 2003), the court rejected a similar argument. Even though the court recognized "that Gucci's quality control measures are likely not foolproof and that authentically-manufactured Gucci items containing deviations may wind up in the retail market," the court concluded that "mere speculation that this unlikely possibility came about in this particular case" was insufficient to

Reed, has previously purchased authentic Fendi goods through the secondary market. (Def.'s Opp. Summ. J. 9-10.) Burlington's prior purchase of authentic goods has no bearing on Minerva's determination that the goods he inspected were counterfeit. *See Motorola, Inc. v. Abeckaser*, No. 07 Civ. 3963, 2009 WL 962809, at *5 (E.D.N.Y. Apr. 8, 2009) (finding that the fact that the defendants may have at one time purchased authentic goods was not inconsistent with the witness's testimony that the goods in question were counterfeit).

Burlington contends that genuine goods can be purchased from retailers other than authorized customers, and, therefore, the source of the goods is not dispositive as to authenticity. Thirty nine products were taken from Burlington; none of which were obtained through an authorized Fendi customer, and all of the products contained numerous deviations from authentic Fendi products. Even if authentic goods could be obtained through non-authorized customers, Burlington has put forth no evidence to counter the multiple deviations identified in each of the products. Burlington has failed to offer any "hard evidence showing that its version of the events is not wholly fanciful." *D'Amico*, 132 F.3d at 149 (2d Cir. 1998). We find that the goods supplied by the Vendors were counterfeit, and Burlington is liable for counterfeiting and false designation of origin.[9]

---

defeat summary judgment. *Duty Free Apparel*, 286 F. Supp. 2d at 289. The bolt of fabric provides nothing more than speculation and is insufficient to defeat summary judgment.

[9] Burlington raises an affirmative defense of laches. A party that seeks equity's assistance must stand before the Court with clean hands. *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000). The defense of laches is not available where the defendant has been found to have intended the infringement. *Id.* As the Court subsequently concludes that Burlington willfully infringed, *infra* Part II.C, the laches defense is unavailable.

### ii. Trademark Dilution

Fendi next moves for summary judgment for trademark dilution pursuant to 15 U.S.C. § 1125(c) and the New York anti-dilution statute, N.Y. Bus. Law. § 360-1.  To prevail on a federal claim of trademark dilution, a plaintiff must establish that "(1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services."  *Savin Corp. v. Savin Group*, 391 F.3d 439, 448-49 (2d Cir. 2004).  This Court previously found that the Fendi trademarks are famous and distinctive and that Burlington began selling counterfeit Fendi goods after Fendi had made its marks famous.  With regard to the requirement of actual dilution, the Court of Appeals for the Second Circuit has found that if "a plaintiff who owns a famous senior mark can show the commercial use of an identical junior mark," there is a presumption of actual dilution.  *Savin Corp. v. Savin Group*, 391 F.3d 439, 452-3 (2d Cir. 2004).  The marks at issue in this case are identical, and Burlington has put forth no evidence to overcome the presumption of actual dilution.

Under New York law, a plaintiff must demonstrate ownership of a distinctive mark and likelihood of dilution of that mark through blurring or tarnishment.  *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 966 (2d Cir. 1996).  Federal law's requirement of "actual dilution" is more stringent than New York's requirement of "likelihood of dilution."  *Savin*, 391 F.3d at 456.  Having already found trademark dilution under the more stringent federal standard, we also find trademark dilution under New York law.

16

### iii.   Unfair Competition Under New York Law

An unfair competition claim under common law is governed largely by the same standards as its Lanham Act counterparts, except common law requires a showing of bad faith or intent. *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir. 1997). Use of a counterfeit mark creates a presumption of bad faith. *Philip Morris U.S.A., Inc. v. Filizardo*, No. 03 Civ. 5891 (HB), 2004 WL 1375277, at *6 (S.D.N.Y. Jun, 18, 2004); *see also Burberry Ltd. and Burberry USA v. Designers Imports, Inc.*, No. 07 Civ. 3997 (PAC), 2010 WL 199906, at *8 (S.D.N.Y. Jan. 19, 2010) ("Burberry's evidence of Defendant's sale of counterfeit Burberry-branded merchandise creates a presumption of bad faith, satisfying the elements of Burberry's common law unfair competition claim."); *Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781 (CM), 2009 WL 1675080, at *15 (S.D.N.Y. Jun. 10, 2009) (finding summary judgment appropriate because "evidence offered by Burberry concerning Moda Oggi's and Euro Moda's sale of merchandise with counterfeit Burberry Marks allows the Court to infer bad faith."). Burlington's sale of counterfeit Fendi-branded merchandise allows this Court to infer bad faith; therefore, summary judgment is appropriate as to Fendi's common law claims of unfair competition.

### c.   Damages

Fendi seeks disgorgement of profits, treble damages, reasonable attorney's fees, prejudgment interest and costs pursuant to 15 U.S.C. § 1117. Under Section 1117(a), a plaintiff is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). In exceptional cases the court may award reasonable attorney's fees to the prevailing party. *Id.* In a case such as

this one, which involves the use of a counterfeit mark, "the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of . . . intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services."  15 U.S.C. § 1117(b).  The question presented is whether there is a genuine issue of material fact as to Burlington's willfulness.[10]

The standard for willfulness is whether the defendant had knowledge that his or her conduct represented infringement or recklessly disregarded the possibility.  *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 288 (2d Cir. 1999); *see Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt.*, No 04 Civ. 2293 (JFB), 2007 WL 74304, at *11 (E.D.N.Y. Jan. 8, 2007) (applying the willfulness standard in *Kepner-Tregoe* to claims brought under the Lanham Act);  *Nike, Inc. v. Top Brand Co.,* No. 00 Civ. 8179 (KMW), 2005 WL 1654859, at *6 (S.D.N.Y. July 13, 2005) (same).  While caution must be exercised in granting summary judgment when state of mind is an issue, the summary

---

[10] Prior to the Trademark Amendments Act of 1999 (the "1999 Amendment"), the Court of Appeals for the Second Circuit required a showing of bad faith or intentional misconduct in order to recover profits for infringement and counterfeiting claims.  *See Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996).  However, the 1999 Amendment specifically added "willful" in reference to a violation under Section 1125(a) but not in reference to a violation under Section 1125(c).  The courts in this Circuit are currently split as to whether this amendment eliminated the requirement of willfulness or "bad faith" for violations of 1125(c).  *See Mr. Water Heater Enterprises v. 1-800-Hot Water Heater*, 648 F. Supp. 2d 576, 589-90 (S.D.N.Y. 2009) (collecting cases); *Malletier v. Dooney & Bourke, Inc.*, 500 F. Supp. 2d 276, 280 (S.D.N.Y. 2007) (finding the willfulness requirement unaffected because the 1999 Amendment "did not alter or even address the relevant subsections of the federal trademark infringement statute"); *Nike, Inc. v. Top Brand Co. Ltd.*, No. 00 Civ. 8179 (KMW), 2005 WL 1654859, at *10 (S.D.N.Y. July 13, 2005) ("Without reason to believe that Congress intended to preserve the Second Circuit rule that preceded the 1999 amendment, the plain language of the statute should govern.").  For the reasons set forth below, we find that Burlington's infringement was willful, and, therefore, need not reach the question of whether the "bad faith" requirement survives the 1999 Amendment.

judgment rule "would be rendered sterile" if the mere existence of an issue as to state of mind would automatically defeat an otherwise valid motion. *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 125 (2d Cir. 2001). Where the defendant offers no probative evidence raising a genuine issue of material fact regarding willfulness, summary judgment is appropriate. *See Tanning Research Lab., Inc. v. Worldwide Import & Export Corp.*, 803 F. Supp. 606, 610 (E.D.N.Y. 1992) ("It is true that questions of a defendant's state of mind are rarely suitable for determination on summary judgment. . . . But defendants have offered no probative evidence raising a genuine issue of material fact regarding their willfully blind violation.").

Fendi puts forth the following evidence to demonstrate that no reasonable trier of fact could find in favor of Burlington on the issue of willfulness: (1) Burlington never took any steps to comply with the 1987 Injunction; (2) Burlington failed to follow its own procedures for preventing the purchase and sale of counterfeits even though it understood the risk associated with buying Fendi-branded goods from parties other than the trademark owner; and (3) Burlington persisted in purchasing and selling counterfeit Fendi-branded goods even after Fendi notified it that the merchandise was counterfeit. (Pl.'s Mem. Summ. J. 28.) Burlington argues that the 1987 Injunction is not relevant. However, the 1987 Injunction was a form of prospective relief, which sought to prevent future counterfeit sales of Fendi-branded merchandise, by preventing Burlington from selling any Fendi-branded merchandise. Fendi entered into the 1987 Injunction to avoid litigation and because of its fundamental distrust of Burlington's ability or desire to distinguish counterfeit merchandise from genuine merchandise. As this Court previously found in our 2007 Opinion, Burlington did not implement any control mechanisms to

ensure its compliance with the injunction. Burlington's in-house counsel, Stacy Haigney, admitted that he was not aware of a single piece of writing concerning any steps that the company took to comply with the injunction. (Pl.'s 56.1 ¶ 16.) By as early as September 23, 1993, Burlington began to violate the injunction. The 1987 Injunction put Burlington on notice, and Burlington's inaction in light of the injunction shows a complete indifference to the authenticity of the merchandise it purchased and sold.

Furthermore, Burlington's continued sale of counterfeit goods after receiving the April 2004 cease and desist letter establishes willfulness in and of itself. In April 2004, Fendi sent a cease and desist letter to Burlington. Burlington did not order the removal of Fendi-branded goods from its shelves until after Fendi commenced the instant litigation in 2006. Courts have repeatedly found willfulness where a defendant receives a cease and desist letter but continues the infringing conduct. *See Motorola, Inc. v. Abeckaser*, No. 07 Civ. 3963 (CPS), 2009 WL 962809, at *8 (E.D.N.Y. Apr. 8, 2009) ("Even if defendants did not know that the goods they sold following receipt of the customs notices and cease-and-desist letter were counterfeit, which appears doubtful from the record, no reasonable juror could conclude that defendants did not at the very least recklessly disregard the possibility that the goods were counterfeit."); *Microsoft Corp. v. Atek 3000 Computer Inc.*, No. 06 Civ. 6403 (SLT), 2008 WL 2884761, at *3 (E.D.N.Y. July 23, 2008) (defendant's continued actions despite being apprised of its infringing conduct, were sufficient to find defendant's conduct willful); *Merchant Media, LLC v. H.S.M. Int'l*, No. 05 Civ. 2817 (JES), 2006 WL 3479022, at *5 (S.D.N.Y. Nov. 30, 2006) ("[T]he fact that defendants continued to sell the infringing items in the face of two cease-and-desist letters from plaintiffs strongly suggests the willfulness of their conduct.");

*Microsoft Corp. v. Compusource Distributors*, 115 F. Supp. 2d 800, 809 (E.D. Mich. 2000) (finding willfulness where upon receipt of a cease and desist letter, the defendant called only two of its vendors and then continued to sell products from the same suppliers "without making any attempt to investigate their assurances that they were distributing genuine Microsoft software and hardware.").

Burlington asserts that it believed that the April 2004 letter was a bluff in an attempt to scare Burlington into taking Fendi merchandise off its shelves.  (Def.'s Response to 56.1 ¶ 220.)  Burlington points to the approximately seventeen month time lag between the first and second cease and desist letters and Fendi's failure to bring suit until 2006 as evidence that Fendi was bluffing.  In *Tanning Research Lab., Inc. v. Worldwide Import & Export Corp.*, 803 F. Supp. 606 (E.D.N.Y. 1992), the plaintiffs sent letters to the defendants in 1988 and 1990, which informed the defendants of their Lanham Act violations.  *Tanning Research*, 803 F. Supp. at 609.  The defendants did not contact the plaintiffs for clarification of the letter but rather relied on "hearsay and self-interested representations" and the plaintiffs' failure to sue.  *Id.* at 609-10.  The court found that the defendants were nonetheless at least willfully blind from the date they received the letter in 1988 accusing them of infringement.  *Id.* at 610.

Even accepting the evidence in the light most favorable to the defendant, we find that Burlington has failed to provide any evidence creating a genuine issue of material fact regarding willfulness.  Burlington received a cease and desist letter and contacted Colton, who supplied the bag at issue.  Four months later Colton sent Burlington an unsigned letter purportedly from Minerva, which stated that the bag was authentic.  Burlington did nothing else to investigate the authenticity of the bag, despite the fact that

the letter was unsigned and that Burlington knew that Fendi contested the authenticity of the letter.  In addition, Haigney testified that buyers were to speak to him prior to purchasing any trademarked goods.  (Pl.'s 56.1 ¶¶ 255-57.)  Yet, Burlington's buyers did not always clear their purchases of Fendi-branded goods with the legal department.  (Pl.'s 56.1 ¶ 257.)  In October 2003, Haigney testified that a buyer approached him regarding the purchase of Fendi-branded goods from Colton.   (Genecin Dec. Ex. 37 ("Haigney Dep.") at 113.)  Haigney told the buyer not to buy the goods because Fendi previously had sued Burlington.  (Haigney Dep. at 113-15.)  This incident occurred just six months before Fendi's first cease and desist letter.  Haigney knew that to prove authenticity he would need to provide "real documentation," (Haigney Dep. at 115), not an unsigned letter from an interested party.  Burlington's failure to investigate the nature of the Fendi goods after the April 2004 cease and desist letter, in light of the 1987 Injunction and Burlington's failure to comply with its own internal procedures, demonstrates that Burlington was willfully blind.

Having determined that Burlington acted willfully, we find that Fendi is entitled to treble damages, along with reasonable attorney's fees,[11] for violations on or after the date of the receipt of the April 2004 letter.[12]  In light of Magistrate Judge Dolinger's prior dealings on these issues with regard to the contempt action, we refer this matter to him

---

[11] Where a plaintiff establishes a case of trademark infringement or false designation, the plaintiff is entitled to recover attorney's fees in "exceptional cases."  15 U.S.C. § 1117(a).  The district courts are given considerable discretion in awarding reasonable attorney's fees.  *Quaker State Oil Refining Corp. v. Kooltone, Inc.*, 649 F.2d 94, 95 (2d Cir. 1981).  Willful infringement generally renders a case "exceptional."  *Id.*; *Motorola*, 2009 WL 962809, at *10.  Attorney's fees are appropriate in this case based on Burlington's willful infringement.

[12] Burlington is also ordered to deliver the counterfeit goods to Fendi for their destruction.  *Johnson & Johnson Consumer Co. Inc. v. Aini*, 540 F. Supp. 2d 374, 396 (E.D.N.Y. 2008); *Fendi S.A.S. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd.*, 642 F. Supp. 1143, 1146-47 (S.D.N.Y. 1986).  Those goods that are still relevant to pending litigation will not be destroyed until the end of that litigation.

for a report on the appropriate amount of damages, attorney's fees, prejudgment interest, and costs.

### d.  Supplemental Permanent Injunction

Fendi also moves to supplement the 1987 Injunction.  Burlington began to violate the 1987 Injunction by receiving Fendi-branded goods into its inventory at least as early as 1993.  (Pl.'s 56.1 ¶ 20.)  Burlington did not stop selling Fendi-branded products until March 3, 2008, almost five months after this Court found Burlington in contempt.[13] (Pl.'s 56.1 ¶ 20-21.)  As the Magistrate Judge noted in his previous recommendation, "Burlington has not acted with due diligence, especially in the wake of the specific findings by the District Court as to the nature and extent of their obligations under the consent injunction."  *Fendi*, 642 F. Supp. 2d at 303.  Thus, we adopted the recommendation of a $1,000 forward-looking sanction, which we understand to mean $1,000 per each item sold in violation of the 1987 Injunction.

"Injunctive relief should be narrowly tailored to fit specific legal violations. Accordingly, an injunction should not impose unnecessary burdens on lawful activity." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir. 2003).  A district court is permitted to fashion an "injunction which will keep a proven infringer safely away from the perimeter of future infringement."  *Id.*  "[A] party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party."  *Oral-B Labs., Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 24 (2d Cir. 1987).  The

---

[13] Burlington argues that the perfume sold during this period was not a violation of the injunction because it was sold pursuant to a "lease agreement" arrangement with Scents of Worth; therefore, though the sales were made through the Burlington retail infrastructure, Burlington never owned or gained title to the merchandise at any time.  (Def.'s Response to 56.1 ¶ 21.)  The Court rejected this very argument in our 2007 Opinion, noting that "Fendi-branded perfume was stocked and handled by Burlington employees, the perfume was sold at the same registers as other Burlington products, and Burlington received 26 percent of the net sales obtained from those items."  *Fendi*, 2007 WL 2982295, at *5.

last twenty-three years supplies ample evidence of how little regard Burlington has for

the 1987 Injunction; we cannot trust that Burlington will develop, let alone implement,

compliance measures on its own.[14]  Therefore, within sixty days of this order, Burlington

is directed to submit to this Court a written report, outlining in detail the manner and

form in which Burlington intends to comply with the 1987 Injunction.  The compliance

plan must be specific to the requirements of the 1987 Injunction, which prohibits

Burlington from purchasing or selling *any* Fendi-branded products without prior

permission.  The Court will not be satisfied with generic internal procedures intended to

prevent trademark infringement.  Six months after that date and every six months

thereafter for the ensuing five years, Burlington is to submit to the Court a report of full

compliance.

### III.    Burlington's Motion to Amend the Answer

Burlington seeks to amend its answer to include a statue of limitations defense to

the contempt claim and limit Fendi's right to recovery to the three years prior to the

instant lawsuit.  Burlington first raised a statute of limitations defense on April 1, 2008

before Magistrate Judge Dolinger.  Although the parties did not discover the sales dated

back to 1993 until after our 2007 Opinion, Burlington was aware at the time of its

Answer and throughout its briefing of the contempt claim that sales of Fendi-branded

products occurred in 2002.  Therefore, we adopted the Magistrate Judge's determination

that Burlington waived the statute of limitations defense when it raised the affirmative

defense of laches in its Answers and prior motion papers but did not raise a statute of

---

[14] In arguing that the injunctive relief sought by Fendi is draconian, Burlington argues that "Fendi's proposed injunction would require[] BCF to obtain written permission before dealing in any Fendi-branded merchandise (not merely counterfeit merchandise) . . . ."  (Def.'s Opp. Summ. J. 21.)  Burlington's continued failure to grasp the requirements of the 1987 Injunction even after this Court found it in contempt is troubling.

limitations defense.  *Fendi*, 642 F. Supp. at 285 n.3.  Furthermore, the Magistrate Judge

found the statute of limitations defense was no longer available to Burlington because a

final judgment on liability had already been rendered.  *Id.*; *see Petramale v. Local Union*

*17, Laborers' Int'l Union of North America*, 625 F. Supp. 775, 782 (S.D.N.Y. 1986),

*rev'd on other gds.*, 847 F.2d 1009 (2d Cir. 1988) ("Since a final judgment has been

rendered, the defense of statute of limitations can no longer be raised. . . .  We must,

therefore, deny [the] motion to amend its answer to include the defense of statute of

limitations.").  Burlington's motion to amend the answer to include a statute of

limitations defense to the contempt claim is denied.

### IV.  Burlington's Motion for Partial Summary Judgment Against the Third-Party Defendants; Colton's Cross-Motion to Dismiss the Third Party Complaint

Burlington moves for partial summary judgment against the Third Party

Defendants, the Vendors, as to liability only on its claim for indemnification.  Colton

cross-moves to dismiss the third party complaint.  The Vendors—Colton, Summit, Euro

Moda, Moda Oggi, and Ashley Reed—sold Fendi-branded merchandise to Burlington.  A

standard form purchase order (the "Purchase Order") was used for those sales.  In the

Purchase Order, the Vendors expressly warranted the authenticity of the merchandise

they supplied.  The Purchase Order also guaranteed that the Vendors would indemnify

Burlington in trademark infringement actions.

### a. Burlington's Motion for Partial Summary Judgment Against the Third-Party Defendants

The Vendors[15] allege that Burlington could not have relied on the warranty in the Purchase Order because the 1987 Injunction prohibited Burlington from the purchase or sale of any Fendi-branded products. A *prima facie* claim for breach of express warranty requires the plaintiff to "show that there was an affirmation of fact or promise by the seller, the natural tendency of which [was] to induce the buyer to purchase and that the warranty was relied upon to the plaintiff's detriment." *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 584 (S.D.N.Y. 2008) (internal citations and quotations omitted). Burlington has demonstrated through the Purchase Order that the Vendors made a promise as to the authenticity of the goods. Furthermore, Burlington relied on that promise to its detriment. Regardless of the 1987 Injunction, Burlington would not be subject to the instant trademark infringement and counterfeit actions but for the Vendors breach of this warranty. The Vendors have pointed to no case law, nor even legal proposition, to support its argument that because of the 1987 Injunction, Burlington could not have relied on the warranty as to the authenticity of the goods. Burlington's motion for partial summary judgment as to liability is granted.[16]

### b. Colton's Cross-Motion to Dismiss the Third Party Complaint

Colton moves to dismiss the Third Party Complaint based on the forum selection clause in the Purchase Order. In order to determine whether to dismiss a complaint based

---

[15] For the purpose of the discussion of this motion, the Vendors include Euro Moda, Moda Oggi and Summit. Ashley Reed does not dispute its liability to the extent that the goods it supplied to Burlington are determined to be counterfeit. For the reasons set forth in Part IV.b, Colton's motion to dismiss the third-party complaint is granted and, therefore, Colton is no longer a party in this action.

[16] Euro Moda and Moda Oggi also allege that a settlement was entered into in June 2008, where Euro Moda and Moda Oggi agreed to give up their independent claims against Burlington, if Burlington agreed to dismiss its claims against Euro Moda and Moda Oggi. Euro Moda and Moda Oggi have put forth no evidence of a settlement; this contention is without merit.

on a forum selection clause the court conducts a four step analysis: (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive; (3) whether the claims and parties involved in the suit are subject to the forum selection clause; and (4) whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that "enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."  *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383-84 (2d Cir. 2007).

The forum selection clause states that "any dispute(s) with respect to the performance and/or interpretations of this contract . . . will be determined under the laws of the State of New Jersey and that any lawsuit(s) arising from any such dispute(s) shall be venued exclusively in the New Jersey Superior Court for Burlington County to whose jurisdiction the Vendor hereby submits for all such lawsuit(s)."  (Colton Opp. 3-4.)  We can easily dispose of the first two inquires.  First, no reasonable communication of the clause was necessary, as Burlington drafted the clause.  Second, the clause confers exclusive jurisdiction and, therefore, is mandatory.  *See Phillips*, 494 F.3d at 386 ("A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language.").  The third inquiry is whether the claims and parties involved in the suit are subject to the forum selection clause.  Burlington alleges that it can proceed on its claims under the Uniform Commercial Code in this Court, even though indemnification based on the Purchase Order warranty may be venued in New Jersey.  However, the clear language of the clause states that it applies to "any dispute(s) with respect to the performance and/or

interpretations of this contract." (Colton Opp. 3-4.) Any action for indemnification based on Colton's performance of the contract falls within the scope of the clause.

"If the forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable." *Phillips*, 494 F.3d at 383. At the fourth step of the inquiry, Burlington must rebut "the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.* at 383-84. Burlington has failed to make any showing, let alone a showing sufficient to overcome the presumption of enforceability. We could postulate the prejudice that could result from a dismissal, such as increased expenses and duplicative proceedings. But given that Burlington has made no showing of prejudice, and we can foresee no such prejudice sufficient to overcome the presumption of enforceability. The forum selection clause is valid.

Burlington alleges that Colton has waived its right to enforce the forum selection clause. Burlington filed the Third Party Complaint in February 2006. For three years, Colton did not invoke the forum-selection clause.[17] Colton answered the complaint with only a generic 12(b)(6) defense, and Colton did not object to this Court's jurisdiction. During the past three years, Colton has participated in discovery.

---

[17]We do not accept Colton's argument that it brought the forum-selection clause objection at the first opportunity. Colton cannot justify the three year delay based on Burlington's failure to specify the basis of the indemnification claim, and at the same time argue that any claim for indemnification based on trademark is governed by the forum-selection clause in the Purchase Order. The Third-Party Complaint, while it does not explicitly reference the Purchase Order, asserts that in selling counterfeit goods the Vendors "breached one or more contracts of sale pursuant to which such counterfeit goods were purchased by retailers." (Third Party Compl. ¶ 16.) The clear language of the Purchase Order states that all disputes arising out of the performance of the contract are venued in New Jersey. However, a waiver is not inferred simply because a party does not invoke a forum-selection clause at the first opportunity. Thus, the question remains whether Colton's three year delay is sufficient to infer a waiver.

The waiver of a chosen forum "is not to be lightly inferred." *Diesel Props S.r.L. v. Greystone Business Credit II LLC*, No. 07 Civ. 9580 (HB), 2008 WL 4833001, at *15 (S.D.N.Y. Nov. 5, 2008) (*citing Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985)).  A court may infer waiver where a long delay has caused prejudice to the opposing party.  *Mateco Inc. v. M/V Elli*, 103 F. Supp. 2d 70, 73 (D.P.R. 2000) (finding a waiver because if the forum-selection clause was after a year and a half delay "would inflict duplicative and unduly complex procedures upon [Plaintiffs].  They would incur severe prejudice through delay, expense, and uncertainty.").  In *Jockey Int'l v. M/V "LEVERKUSEN EXPRESS"*, Judge Haight distinguished *Mateco*, emphasizing that "the most significant factor was the delay in asserting the right which prejudiced the parties as well as the court."  217 F. Supp. 2d 447, 456 (S.D.N.Y. 2002).  Although Colton delayed three-years in raising the forum-selection clause, Colton's role in the lawsuit to date has been somewhat marginal.  Dismissal of this case will lead to some increased expenses and duplicative proceedings, but Burlington has failed to allege any prejudice it will suffer from the enforcement of the forum-selection clause that it authored itself.

In *LPR, SRL v. Challenger Overseas LLC*, Judge Koeltl refused to find a waiver and found "no reason to depart from this usual rule in this case because the plaintiff had sufficient notice of the forum selection clause.  It chose to bring the action in this Court in the face of a clear forum selection clause."  *LPR, SRL v. Challenger Overseas, LLC.*, No. 99 CIV. 8883 (JGK), 2000 WL 973748, at *7 (S.D.N.Y. July 13, 2000).  Burlington knew that the forum-selection clause venued this action in New Jersey but believed that it would be more efficient to have its third-party indemnification claims adjudicated in this Court where the underlying action giving rise to those claims was being adjudicated.

(Burlington Reply Partial Summ. J. 2.)  Burlington made the decision to bring this case in this Court with full knowledge of the forum-selection clause it drafted, and has alleged no prejudice that will result from the enforcement of that clause.  We find that the forum selection clause is enforceable and Colton's motion to dismiss the third party complaint is granted.

**V.     Burlington's Objections to Magistrate Judge Dolinger's December 1, 2009 Report and Recommendation**

Noting that the Court enjoys wide discretion in fashioning an appropriate judgment with regards to the amount and method of calculation of prejudgment interest, *see, e.g.*, *Jones v. UNUM Life Ins. Co.*, 223 F.3d 130, 139 (2d Cir. 2000), Magistrate Judge Dolinger engaged in a carefully reasoned analysis in the December 1, 2009 Report and Recommendation ("R&R") that attempted to address the equities of the present case. *See Jones*, 223 F.3d at 139 (The goal of crafting an appropriate prejudgment interest calculation is to adequately address the "circumstances of the individual case" by considering the "remedial purpose" of the judgment, the "fairness and the relative equities of the award," and "the same considerations that inform the court's decision whether or not to award interest at all.").  Both Fendi and Burlington agree with Magistrate Judge Dolinger's selection of the interest rate in 26 U.S.C. § 6621(a)(2), but Burlington objects to several elements of the proposed calculation.  Fendi urges us to adopt the R&R.

We note at the outset that due to the paucity of Burlington's own records, Magistrate Judge Dolinger crafted his proposed calculation in the face of considerable uncertainty as to the timing and quantity of Burlington's contemptuous sales.  (*See, e.g.*, R&R at 27-28.)  Burlington objects to Magistrate Judge Dolinger's recommendation that

net profits from Burlington's sales of Fendi goods from 1993-1999 should be spread evenly over that time period due to Burlington's incomplete records. Burlington protests that profits for those years should be allocated based on season codes, which have been used by both parties' experts to estimate sales timing. (Def.'s Objections 8.)

However, Magistrate Judge Dolinger's recommendation was based in part on recognizing the very real possibility that the disgorgement amount did not capture all contemptuous sales, due to Burlington's lack of records for the years 1987-1993. (R&R at 27-28.) For this reason, we adopt Magistrate Judge Dolinger's recommendation as to the allocation of the profits over time, as well as his recommendation (1) to treat profits as if they were made on the first day of each fiscal year and (2) to spread shipping costs evenly over the relevant time period.[18]

Burlington objects to using a fixed interest rate rather than a floating rate that is determined quarterly, as is used by the IRS in calculating interest on tax underpayments. *See* 26 U.S.C. § 6621(a)(2). However, as is made clear by Magistrate Judge Dolinger's decision not to compound interest daily, thoroughgoing adherence to the statutory scheme is not the goal in the instant matter. Rather, the goal is to craft a prejudgment interest calculation that adequately addresses the unique circumstances and equities of the case, which the R&R accomplishes admirably and persuasively. Burlington's objection is rejected.

Burlington next objects to the calculation of income taxes attributable to contemptuous sales, and claims it should be entitled to deduct $973,732 instead of $152,528 in income taxes. Because we adopted Magistrate Judge Dolinger's

---

[18] Although spreading shipping costs evenly over this time period may mean some shipping expenses are allocated to perfume sales, a development favoring Burlington, Fendi has not objected to the R&R. (Pl.'s. Resp. to Def.'s. Objections 1.)

disallowance of the deduction of "store expenses" from Burlington's gross profit on the sale of Fendi goods, Burlington objects that it should be able to deduct more income tax than was recommended in the December 1, 2009 R&R. Mr. Berliner, Burlington's accounting expert, originally calculated income taxes based on the assumption that store expenses would be deductible, and applied a tax rate of 38% to pre-tax profits net of store and shipping expenses, resulting in an income tax provision of $152,528. This figure was adopted by Magistrate Judge Dolinger despite the disallowance of the store expenses deduction. Burlington claims it should be allowed to deduct a tax provision equaling 38% of a pre-tax profit figure unreduced by the store expenses deduction, resulting in an income tax provision of $973,732.

However, when income taxes are determined for the purpose of reducing a damage award, the goal is to ascertain as nearly as is practicable the actual amount of income taxes paid that were attributable to the contemptuous sales. *See In Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 566-67 (2d Cir. 1994) ("[The district court] should have allowed K-Mart a deduction for the taxes *it paid* on its innocently-acquired unlawful profits.") (emphasis added); *cf. Sheldon v. Metro-Goldwyn Pictures Corp.,* 106 F.2d 45, 54 (2d Cir. 1939) (overhead that does not assist in production of infringing item "should not be credited to the infringer; that which does, should be"), *aff'd,* 309 U.S. 390 (1940). Furthermore, "the burden is on the contemnor 'to prove any deductions for its costs from the gross revenues attributable to its contempt . . . .'" *Oral-B Laboratories, Inc. v. Mi-Lor Corp.* 810 F.2d 20, 26 (2d Cir. 1987) (*abrogated on other grounds as recognized in Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577 (2d Cir. 1993)). Regardless of the disallowance of the store expenses deduction from the damage award,

the burden is on Burlington to show that the higher amount of taxes was actually paid and was attributable to the infringing sales. Because Burlington has not made this showing, the Court finds Mr. Berliner's original estimation of income taxes paid and allocable to infringing sales more plausible. Accordingly, Burlington's objection is rejected.

For the foregoing reasons, we adopt Magistrate Judge Dolinger's December 1, 2009 Report and Recommendation in its entirety.

## VI.    Conclusion

Fendi's motion for summary judgment is granted, and we refer the matter to Magistrate Judge Dolinger for a report on the appropriate amount of damages, attorney's fees, prejudgment interest and costs. Within sixty (60) days of this Order, Burlington is directed to submit a compliance plan to the Court. Six months after that date and every six months thereafter for the ensuing five years, Burlington is to submit a compliance report to the Court. Colton's cross-motion to dismiss the third-party complaint is granted. Burlington's motion for partial summary judgment against Ashley Reed, Euro Moda, Moda Oggi and Summit is granted. The December 1, 2009 Report and Recommendation is adopted in its entirety.

**SO ORDERED.**

Dated: _Feb 8_, 2010
         New York, NY

_____
                                                        U.S.D.J.